**In re PAPERCRAFT CORPORATION, a Pennsylvania corporation, Debtor.**

**COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS and Committee of Creditors Holding Unsecured Claims, As Estate Representative of Papercraft Corporation, Plaintiffs,**

**v.**

**CITICORP VENTURE CAPITAL, LTD., a New York corporation, Defendant.**

Bankruptcy No. 91–20903 JKF.
Adv. No. 91–2642.

United States Bankruptcy Court,
W.D. Pennsylvania.

April 22, 1994.

Philip E. Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, PA, and Stephan M. Ray, Stutman, Treister & Glatt, Los Angeles, CA, for plaintiffs.

Paul K. Vey, William Pietragallo, II, Pietragallo, Bosick & Gordon, Pittsburgh, PA, and George J. Wade, Terri Brady, Shearman & Sterling, New York City, for defendant.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

### I. Introduction

The matter before the court is a motion for partial summary judgment on an objection to claims filed on behalf of the Committee of Creditors Holding Unsecured Claims and the Committee in its separate post confirmation capacity as representative of the estate of Papercraft Corporation (hereafter "Commit-

tee" and "Debtor" respectively). Pursuant to 11 U.S.C. § 502(b)(1), the Committee seeks to limit "the allowance of the claims" held by Citicorp Venture Capital, Ltd. (hereafter "CVC"), "to no more than the sum CVC actually paid for such claims." Motion for Partial Summary Judgment, Adversary No. 91–0642 at 1. Post petition, CVC purchased first and second priority notes on the secondary market and filed a claim for their face value. The allowance of the claim at the amount CVC paid would result in a distribution to CVC through the confirmed plan of reorganization (hereafter "the BDK Plan") of less than it expended to purchase the claim. Allowance at face value would result in a profit to CVC of nearly $5.5 million. A third alternative is to limit the plan distribution to CVC without disturbing the allowed amount of its claim.

A bankruptcy court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056. We find that this action is appropriate for disposition by summary judgment as there is no dispute of any relevant, material fact. Both parties are in agreement as to the following material facts:

(1) prepetition, CVC held no direct interests in or claims against Debtor.

(2) postpetition, while Debtor was insolvent, CVC purchased notes of Debtor with a face value [1] of $60,849,299.10. Deposition of M. Saleem Muqaddam at 156–61 (hereafter Muqaddam Deposition); Plaintiff's Exhibit 8.

(3) CVC's cost for the notes was $10,553,541.88. *Id.*

(4) If the claims purchased by CVC are allowed at the face value of the notes, payments to CVC under Debtor's confirmed Chapter 11 plan would result in a profit of

---

1. Face value includes the actual face value of the notes and any accrued interest up to the date of bankruptcy.

nearly $5.5 million to CVC.[2] Declaration of Samuel M. Victor in Support of Motion for Partial Summary Judgment at ¶ 11.

(5) M. Saleem Muqaddam, at all times relevant, was a vice president of CVC and a member of the boards of directors of Debtor, Debtor's parent, and Debtor's principal subsidiaries.

### The Issues

We are called upon to determine in this core proceeding whether CVC acted in bad faith or breached its fiduciary duties to Debtor and creditors of the estate by using inside information while purchasing its claims and formulating its offer to purchase the assets of Debtor's operating subsidiaries. This opinion constitutes findings of fact and conclusions of law.

### Summary of Findings

■ For the reasons which follow, we find, as a matter of law, that CVC is an insider of Debtor and that its fiduciary duty to Debtor and the estate required, at a minimum, that CVC advise Debtor, Debtor's shareholders, the Committee, and those from whom it purchased its claims of its identity and its connection with Debtor. CVC held its insider status through Muqaddam, CVC's representative on Debtor's board of directors, who is an insider by statutory definition. 11 U.S.C. § 101(31)(B). Through Muqaddam, CVC was able to purchase claims and had access to inside information, which was unavailable to other buyers or to the sellers, regarding the potential returns on and value of the notes purchased. It is the access to inside information which removes the purchase from the category of arm's length transactions and results in limitations on insiders' claims being applied to CVC.[3] See Wolf v. Weinstein, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33, rehearing denied, 373 U.S. 928, 83 S.Ct. 1522, 10 L.Ed.2d 427 (1963). See also In re Van Sweringen Co., 119 F.2d 231, 234 (6th Cir.), cert. denied, 314 U.S. 671, 62 S.Ct. 136, 86 L.Ed.2d 537 (1941) (a trustee can make no profit from his trust). We hold that because CVC is an insider its distribution through the plan of reorganization is limited to no more than the amount CVC actually paid for the notes it purchased. In re UVAS Farming Corp., 91 B.R. 575, 577–78 (Bankr.D.N.M.1988). Cf., In re Van Sweringen Co., 119 F.2d at 234 (purchase of claims of debtor corporations by corporation created by directors of debtors "at substantially less than real values" required that the claims be limited to the amount paid for their acquisition).

Accordingly, the Committee's motion will be granted in that CVC's distribution will be

---

2. The expected profit is calculated as follows:

| | Face Value | Cents/Dollar | Plan Distribution |
|---|---|---|---|
| First Priority Notes | $34,725,575.72 | 33.46¢ | $11,619,177.64 |
| Second Priority Notes | 26,123,723.38 | 16.73¢ | 4,370,498.92 |
| | $60,849,299.10 | | $15,989,676.56 |
| | | Less Cost to Citicorp | 10,553,541.88 |
| | | Expected Profit | $ 5,436,134.68 |

The "Face Value" amounts represent the full value, as defined in footnote 1, of First and Second Priority Notes held by CVC. See Muqaddam Deposition at 156–61 and Plaintiff's Exhibit 8. The "Cents/Dollar" distribution factors represent the approximate reorganization value of the notes under the BDK plan which was confirmed by this court. See Declaration of Samuel M. Victor in Support of Motion for Partial Summary Judgment, Motion for Summary Judgment, Exhibit 2 at ¶ 11. (Samuel Victor is the executive vice president and a principal of Chanin & Company, financial advisor to the Committee.) The "Plan Distribution" calculations are estimates of the amount to be distributed under the plan. The "Expected Profit" is based on the estimated distributions under the plan.

3. The federal securities laws have similar restrictions on persons possessing inside information and require disclosure prior to trading a security, absent which trading is prohibited. See Rule 10b–5 of the Securities Exchange Act of 1934. See also Rule 14e–3(a) of that Act concerning tender offers. The policies of disclosure and fairness to the public of the securities and bankruptcy laws are similar. For the case against applying federal securities laws to claims trading in bankruptcy see Anthony M. Sabino, No Security in Bankruptcy: The Argument Against Applying the Federal Securities Laws to the Trading of Claims in Bankruptcy, 23 Pacific L.J. 109 (1992).

limited to the amount it paid to purchase its claims, without interest.

## II. Background

Debtor filed a voluntary Chapter 11 bankruptcy petition on March 22, 1991, largely as the result of carrying significant debt stemming from a leveraged buyout (hereafter "LBO") in 1985. The LBO, in which CVC was involved, transformed Debtor from a publicly traded company into a wholly owned subsidiary of its parent, Amalgamated Investment Corporation (hereafter "Amalgamated").[4] Through the LBO, CVC acquired a 28 per cent equity position in Amalgamated which entitled it to a seat on the boards of Amalgamated, Debtor, and Debtor's primary subsidiaries. Muqaddam held those seats, having been nominated by CVC.

During the period from the LBO to the bankruptcy filing, Debtor experienced a decline in business performance and was haunted by its heavy debt burden, resulting in debt restructuring agreements in 1989 and 1990.[5] The 1989 restructuring saw the exchange of approximately 98 per cent of Debtor's debentures for First Priority Notes and Second Priority Notes. See Declaration of Pamela M. Cascioli in Support of Motion for Partial Summary Judgment, Motion for Partial Summary Judgment at Exhibit 1. The 1990 agreement was approved unanimously by Debtor's board of directors, including Muqaddam, and was essentially what became the original BDK Chapter 11 plan of reorganization which Debtor filed on March 25, 1991, just three days after filing this bankruptcy. Its terms had been negotiated with the existing creditors prepetition. On March 22, 1991, the date of the bankruptcy filing, Debtor was liable for $90,717,358.00 on First Priority Notes and $56,318,768.00 on Second Priority Notes. On that date CVC held *none* of Debtor's First or Second Priority Notes.

Within one week of Debtor's bankruptcy filing and just a few days after the BDK plan was filed with Muqaddam's concurrence, Muqaddam obtained approval from CVC to expend in excess of $10,000,000 for the purchase of notes owed by Debtor. Without notifying Debtor[6] or the Committee, and without identifying CVC or its connection with Debtor through Muqaddam to the sellers, Debtor's shareholders, or the Committee, CVC authorized Muqaddam to purchase, on CVC's behalf, a total of $60,849,299.10 of Debtor's First and Second Priority Notes for a total expenditure of $10,553,541.88. *See* footnote 2 and Exhibit 8.[7] Muqaddam never sought Debtor's approval for the purchase (Muqaddam Deposition at 167), never dis-

4. Amalgamated filed a chapter 7 petition in this district on October 17, 1991, at Bankruptcy Number 91–3710. The combined debt of Debtor and Amalgamated exceeded $280 million.

5. According to the approved Disclosure Statement, Debtor sold substantial assets prepetition, thereby satisfying all but one of its secured debts. The remaining secured claim was approximately $300,000.00. Thus, at the time the bankruptcy was filed, Debtor's obligations to its noteholders were its largest debts. Its other debts included lease rejection and small priority claims, a pension liability which was assumed by Debtor's subsidiaries, and claims of affiliates and stockholders. For further explanation of the claims, see the Transcript of the Plan Confirmation Hearing dated January 21, 1992. The noteholders were all placed in Class 4, the general unsecured class, in the BDK plan.

6. *See, e.g.* Kane Deposition at 73 wherein Frank Kane, Debtor's former chief financial officer, states that he did not know of the note purchases by CVC until after the fact.

7. After acquiring the claims and before sending a "letter of interest" dated September 13, 1991, to Debtor's CEO, Michael C. Arnold, regarding forming new corporations to acquire assets and liabilities of certain other companies as part of the plan of reorganization, Muqaddam spoke with Pamela Cascioli, Chairperson of the Committee of Unsecured Creditors, and mentioned that CVC had purchased some notes. Muqaddam Deposition at 379–80. *See* Exhibit 14, letter dated September 13, 1991, from M. Saleem Muqaddam of CVC to Michael C. Arnold of Debtor. No details were provided, nor was the fact mentioned that CVC's acquisition put it in voting control of its class of creditors. Muqaddam Deposition at 379–80, 382. In a declaration attached to the Committee's Motion for Partial Summary Judgment, Cascioli stated that, before the September 13 letter, "a member of the Committee briefly mentioned ... that ... a member of the [prepetition] Informal Committee, had sold its notes, and a rumor that Citicorp had been the purchaser...." Motion for Partial Summary Judgment at Exhibit 1, ¶7. The discrepancy between Muqaddam's and Cascioli's statements is not material because in neither scenario was the disclosure timely or sufficient.

closed to Debtor or the Committee before it purchased (Muqaddam Deposition at 154–55, 167–68), and never disclosed so much as its identity or its relationship on the board of directors to the sellers (Muqaddam Deposition at 165–66). These purchases gave CVC voting control over Class 4, an impaired class of general unsecured claims, in the BDK plan. All trading occurred between April 1, 1991, and August 30, 1991. Through these purchases, CVC, which had no interest in or claims against Debtor prepetition, acquired approximately forty percent of all outstanding notes, thereby gaining the ability to control the voting in its class on a reorganization plan. As a further result of the purchases, CVC was in a position to gain a potential profit under the confirmed plan of approximately $5.4 million if its allowed claim were equal to the face value of the notes.[8] *See* Footnote 2 and Victor Declaration at ¶ 11.

Although Debtor filed the BDK plan three days after it commenced this case, it did not file an accompanying disclosure statement until October 25, 1991. Thus, the plan confirmation process was stymied. Prior to the confirmation of the BDK Plan and after the purchase of claims by CVC which gave it voting control over a plan, CVC convinced Debtor to take the unusual step of propounding a second, conceptually different plan. Thus, Debtor filed two plans—the previously

filed BDK plan and the new CVC plan. The BDK plan essentially provided for a reorganization of Debtor through the formation of a new company by merger, a stock for debt exchange and certain cash payments. The second, "CVC," plan essentially was a cash offer by CVC to buy certain assets and operating subsidiaries of Debtor without acquiring certain associated liabilities. Neither the Debtor nor any other party in interest had solicited this offer. Muqaddam Deposition at 120–21. Thereafter, CVC filed objections to the BDK Plan.[9] After certain hearings, Debtor withdrew the CVC plan.

CVC's actions raise the question of whether CVC acquired its position as a noteholder so as to effect a takeover via its status as a "creditor" with voting control and/or to profit from a distribution significantly in excess of its acquisition cost under the guise of the Bankruptcy Code.[10] CVC did not acquire its claims in the same fashion as the other members of its class, who obtained their claims prepetition without knowledge of the bankruptcy or the anticipated distribution to unsecured creditors. *See Vultures Beware* at 924 and n. 39. Its failure to disclose to the selling noteholders that it had access to inside financial information which could assist in evaluating the return to the sellers through the reorganization if they had held their notes, whether or not the information

---

**8.** The ability to cause a rejection of the plan through voting control was a significant issue regarding the confirmability of a plan because of the claims structure in this case.

**9.** The consequence of this device is not unlike a hostile takeover attempt, albeit one with Debtor's name attached to the alternative plan. *See Vultures Beware: Risks of Purchasing Claims Against a Chapter 11 Debtor,* 48 Bus.Law. 915, 924 (May 1993) (hereafter *Vultures Beware* ).

The factual pattern just described falls within the prototype of "vulture investing" as it appears in *Vultures Beware:*

The typical *modus operandi* of a vulture investor is to purchase trade claims, bank debt, or other securities at a discount from the face amount, and often to purchase sufficient voting power to enable the vulture investor to block confirmation of any plan of reorganization proposed for the debtor that the vulture investor does not like. (Footnote omitted.)

*Vultures Beware,* 48 Bus.Law. at 916.

Vulture investors may control the terms for the reorganization of a debtor in chapter 11 by

means of the purchase at bargain prices of a blocking vote position in a significant debt class. This could enable a vulture investor to dictate the terms of the reorganization, which could result in very large rewards for the investor. The reason that vulture investors are able to reap such large returns is that some chapter 11 debtors end up in chapter 11 not so much because their businesses have gone bad, but because of the leveraged debt that they could not shoulder ... The result can [have] ... the vulture ending up with the dominant ownership position in a good business, after having paid a bargain price for a debt position which merely served as a means to acquire the debtor's business through the vehicle of chapter 11. (Footnote omitted.)

*Id.* at 917.

**10.** Obtaining voting control and achieving a profit may not be objectionable under other fact patterns. Here, however, an insider placed itself in such a position without making the necessary disclosures and is not entitled to profit from its efforts.

was used in CVC's purchase of claims, prohibited the sellers from accurately assessing the true market value of their claims or the loss or benefit to be derived from the sale. CVC's failure to disclose constituted a misuse or abuse of the bankruptcy process by an insider. *See* Joy Flowers Conti, Raymond F. Kozlowski, Jr., Leonard S. Ferleger, *Claims Trafficking in Chapter 11—Has the Pendulum Swung Too Far?*, 9 BANKRUPTCY DEVELOPMENTS JOURNAL # 2, at 281, 299 (1992) (hereafter *Claims Trafficking* ).

### III. CVC is an Insider

The Bankruptcy Code defines an insider of a corporate debtor as *including* directors, officers of the debtor, persons in control of the debtor (and other entities not relevant to the issue herein). 11 U.S.C. § 101(31)(B). Although there are numerous bankruptcy court decisions regarding the scope of the definition of "insider," few courts of appeals have passed on the question. Those which have addressed the issue agree that the definition's use of the word "includes" suggests an expansive interpretation of the term rather than a narrow one. *See Matter of Holloway*, 955 F.2d 1008 (5th Cir.1992); *Matter of Newcomb*, 744 F.2d 621, 625 n. 4 (8th Cir. 1984); *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 210 (5th Cir.1983). The broader view of the scope encompassed by the definition of insider is based on legislative history which teaches that an insider "is an entity or person with a 'sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'" *Missionary Baptist*, 712 F.2d at 210, citing S.Rep. No. 95–989, 95th Cong., 2d Sess. *See also Matter of Holloway*, 955 F.2d at 1010; *Matter of Newcomb*, 744 F.2d at 625, n. 4. What constitutes a "sufficiently close relationship with the debtor" is a question of fact. *Cf., Matter of Holloway*, 955 F.2d at 1014 ("the determination of insider status is a question of fact").

■■■ We find that the undisputed facts [11] establish that CVC had a "sufficiently close relationship" with Debtor to place CVC within the statutory definition of insider.[12] Through its equity position in Amalgamated, Debtor's parent and affiliate as defined in 11 U.S.C. § 101(2), CVC controlled, pre-petition, at least one seat on each of the boards of directors of Amalgamated, Debtor, and Debtor's principal subsidiaries. These seats were occupied by CVC's vice president, Muqaddam. Muqaddam Deposition at 17–18, 21.

11. In its original answer to the Committee's Complaint CVC averred that the Committee's allegation of CVC's insider status was a conclusion of law. In its amended answer filed on December 23, 1991, CVC admitted its insider status, then denied it in its Response to First Request for Admissions filed on January 10, 1992. CVC again admitted its insider status in its Second Amended and Restated Answer to Complaint filed on May 18, 1992.

12. Cases in which insider status has been attributed to those not specifically enumerated in § 101 include *In re Holloway*, 955 F.2d 1008 (5th Cir.1992) (divorced spouses); *In re Tanner*, 145 B.R. 672 (Bankr.W.D.Wash.1992) (lovers); *In re Standard Stores, Inc.*, 124 B.R. 318 (Bankr. C.D.Cal.1991) (corporate debtor's president's ex-brother-in-law); *In re O'Connell*, 119 B.R. 311 (Bankr.M.D.Fla.1990) (friend who made several informal loans to the debtor); *In re Ribcke*, 64 B.R. 663 (Bankr.D.Md.1986) (parents of debtor's deceased wife); *Matter of Montanino*, 15 B.R. 307 (Bankr.D.N.J.1981) (parents of debtor's live-in fiance). Financial power over the debtor may be insufficient in and of itself to make an entity an insider. In *In re Torcise*, 146 B.R. 303 (Bankr.S.D.Fla.1992), the court held that, in order for a bank or its officers to be insiders in a preference action, they must have "unreasonable control" over the debtor or the debtor must have become the bank's alter ego or instrumentality. The instant action does not involve a preference. It involves an attempt to profiteer through a purchase at a deep discount, without disclosure. *Cf. In re Polk*, 125 B.R. 293 (Bankr.D.Colo.1991) (the degree of control as a factor in determining insider status). Whereas control, reasonable or otherwise, is not the only test of insider status, control may be one of many factors to consider in determining insider status. In this case CVC was a large shareholder in Debtor's parent and held seats on the boards of the parent, Debtor and Debtor's subsidiaries. Moreover, Muqaddam, its officer and one of Debtor's directors, was its instrumentality. Muqaddam testified in deposition that he acted for CVC's benefit and on its behalf. Muqaddam Deposition at 6, 11–12. *See also* Muqaddam Deposition at 398–99 (Muqaddam decided to object to confirmation of the BDK Plan because it restricted distribution to CVC). Through Muqaddam CVC achieved its insider status. Through Muqaddam CVC was a de facto director and therefore was in a position to and did exercise some control.

Muqaddam was CVC's representative on the board because Pennsylvania law requires that corporate directors be natural persons. 15 Pa.Cons.Stat.Ann. § 1722. Thus, CVC itself could not serve as a director and had to designate a natural person, i.e., Muqaddam, to act on its behalf. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49, 356, 105 S.Ct. 1986, 1991, 1995, 85 L.Ed.2d 372 (1985) (a corporation, as an inanimate object, empowers agents to act on its behalf). Muqaddam testified that his duties as an employee of CVC include investing on CVC's behalf. Muqaddam Deposition at 6. Other duties include serving on the boards of directors of other companies in which CVC holds investments. Muqaddam Deposition at 18–19. As a vice president of CVC, Muqaddam was responsible for acquiring and monitoring CVC's investment in Debtor and related entities. Muqaddam Deposition at 11–13, 153. *See also id.* at 6, 398–99 (Muqaddam objected to confirmation of the BDK plan because it restricted distribution to CVC). He acknowledged in his deposition that he served on Debtor's board on behalf of CVC (Muqaddam Deposition at 15) and that he acted as a director of Debtor to monitor CVC's investment. *Id.* at 20. Through Muqaddam's position on Debtor's board, CVC had access to financial information with respect to Debtor and its reorganization plans.

CVC argued at the hearing on the motion for partial summary judgment that the Committee had the same access "to management of the company" and to "the basic underlying facts." Notes of Testimony of June 24, 1992, at 41. However, it did not go so far as to contend that the Committee had equal access to the analyses of those facts or that the Committee was an entity sufficiently close to Debtor to be an insider. *Id.* Furthermore, CVC took part in various business decisions concerning Debtor, and was in a strategic and unique position regarding Debtor's restructuring and reorganization. This is further evidenced by the fact that when certain objections of CVC to the BDK plan were not withdrawn,[13] the issue of whether the plan was confirmable as fair and equitable without CVC's consent was present.

To illustrate CVC's superior access to financial and business information and its control over Debtor, we set out some of the facts of record. Muqaddam, while on Debtor's board, approached CVC with the proposition that CVC purchase claims against Debtor. CVC then authorized the purchases and provided the funds. Muqaddam testified with respect to CVC's proposed purchase of the assets of subsidiaries, Knomark and Barth & Dreyfuss, that he relied on "information about the businesses and some financial information about these companies from ... periods ... prior to 1990", Muqaddam Deposition 270 at lines 17–21, including data gleaned from a visit to Barth & Dreyfuss, as well as from published sources. Muqaddam Deposition at 270. Muqaddam also had financial projections that had been "supplied to the creditors' committee or were developed for that purpose." *Id.* at 271, lines 6–7. Some aspects of those projections were supplied to the Bank of New York with which CVC was discussing financing arrangements for the asset purchase plan that CVC was attempting to put together. *Id.* at 271. Further, Muqaddam expected CVC's offer through the CVC Plan to be accepted by the Committee because the value was within the range developed by the adviser to the pre-debt restructuring debenture bondholders. Muqaddam Deposition at 345. Muqaddam acquired this information from Debtor's management.[14] Muqaddam also testified that the CVC plan of reorganization filed by Debtor was based on CVC's proposed asset purchase. Muqaddam Deposition at 449. In order to prepare the asset purchase offer Muqaddam requested and received from Debtor a financial analysis of Debtor prepared by the Committee's accountant. Muqaddam Deposition at 488–89.

---

**13.** These entailed CVC's desire for (1) a seat on the board of the reorganized company and (2) a change in the distribution language of the plan. When those goals were achieved, the remaining objections were withdrawn, and the BDK plan was confirmed on January 21, 1992.

**14.** Muqaddam said he "heard" the range from management and that it was "possible" that he actually had seen valuations prepared by the bondholders' adviser. Muqaddam Deposition at 345–46.

Frank T. Kane, Debtor's former chief financial officer, testified that financial projections prepared by or for Debtor in connection with the bankruptcy were modified at the request of Muqaddam or a member of his staff with reference toward CVC's proposed asset purchase. Kane Deposition at 80–81 (hereafter "Kane Deposition"). Although the projections were a part of Debtor's records, they were never provided to Chanin & Company (the financial advisers to the Committee), to any member of the creditors' committee, or to its counsel. Kane Deposition at 81.[15]

Due to Muqaddam's unique position he was able to obtain financial information not otherwise available.

## IV. Fiduciary Duty

■■■ Generally, a member of the board of directors holds a fiduciary duty "to promote the interests of the corporation." *United ed States v. Byrum*, 408 U.S. 125, 138, 92 S.Ct. 2382, 2391, 33 L.Ed.2d 238, *rehearing denied*, 409 U.S. 898, 93 S.Ct. 94, 34 L.Ed.2d 157 (1972).

> In general, officers and directors of a corporation are required to devote themselves to the affairs of the corporation with a view to promoting its interests rather than their own. They may not utilize their position in the corporation to obtain any personal profit or advantage beyond that enjoyed by its shareholders.

*In re Gailey, Inc.*, 119 B.R. 504, 511 (Bankr. W.D.Pa.1990). Furthermore, it is a longstanding rule that "directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985). *See also Wolf v. Wein-*

*stein*, 372 U.S. 633, 649, 83 S.Ct. 969, 979, 10 L.Ed.2d 33, *rehearing denied*, 373 U.S. 928, 83 S.Ct. 1522, 10 L.Ed.2d 427 (1963). Upon insolvency of the corporation, the director's fiduciary duty extends to the corporation's creditors and is enforceable by the trustee. *See Pepper v. Litton*, 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir.1973). The fiduciary duty of a director of a bankrupt corporation has sometimes been compared to that of a trustee. Neither a trustee nor a director may make a profit from the bankrupt corporation. *See Magruder v. Drury*, 235 U.S. 106, 119–20, 35 S.Ct. 77, 82, 59 L.Ed. 151 (1914).

■■■ Under the circumstances described in this opinion, CVC was an insider which held the same fiduciary duty to Debtor as did Muqaddam, as though CVC were a de facto director of Debtor. Although directors may purchase claims against their corporation when the corporation is solvent, they are not entitled to do so at a discount and enforce the claims at full value when the corporation is insolvent or has filed bankruptcy. *In re Bridgford Co.*, 237 F.2d 182, 185 (9th Cir. 1956). *See also Manufacturers Trust Co. v. Becker*, 338 U.S. 304, 313–14, 70 S.Ct. 127, 132–33, 94 L.Ed. 107 (1949), *Monroe v. Scofield*, 135 F.2d 725 (10th Cir.1943), *In re UVAS Farming Corp.*, 91 B.R. 575, 577 (Bankr.D.N.M.1988) (when a director purchases claims against its corporation in bankruptcy, recovery is limited to the amount paid for the claims). This is not a situation where a Chinese wall was implemented with policies and procedures effective to prevent the misuse of nonpublic information, *see In re Federated Dept. Stores, Inc.*, 1991 WL 79143 (Bankr.S.D.Ohio, March 7, 1991), nor does it have any of the earmarks of an arm's length transaction. The bankruptcy court is not required to treat these claims equally

---

**15.** Although projections were provided to the Committee, they apparently were not the same as those contained in the modifications provided to CVC. Kane Deposition at 80–88. CVC also requested, and was provided, projections of monthly working capital and income distribution but Kane was not sure if the numbers used were those based on CVC's assumptions or if the information was based on Debtor's projections. *Id.* at 85. However, Kane also testified that Muqad-

dam "or one of his representatives" had asked for "a monthly model for an income statement, balance sheet and cash flow to disclose to [CVC] the working capital changes and income statement movement within a prescribed period of time," *id.* at 87, with respect to the Barth & Dreyfuss subsidiary in order to determine that company's seasonal credit requirements. *Id.* at 88.

with those of other creditors.[16] *See Pepper v. Litton*, 308 U.S. at 306–07, 60 S.Ct. at 245.

Although Muqaddam was a director of Debtor, he acted on behalf of CVC, of which he was an officer, in its best interests and with its express approval. Muqaddam adhered to CVC's directives rather than to his fiduciary obligation to act in the best interests of Debtor and Debtor's estate. In so doing, his actions as a director of Debtor were taken with improper motive; that is, to benefit CVC, not to serve Debtor or its creditors. Through Muqaddam, CVC was able to obtain a blocking position with respect to the plan of reorganization which it then attempted to use in its own self-interest, to its advantage by the proposal of a plan different from the BDK plan.

 Furthermore, the availability of claims for purchase at a discount pursuant to a bankruptcy constitutes a corporate opportunity. *Brown v. Presbyterian Ministers Fund*, 484 F.2d at 1004, *citing Weissman v. Weissman, Inc.*, 374 Pa. 470, 97 A.2d 870 (1953). Outside of bankruptcy, if the corporation is unable to use the corporate opportunity, a director may do so *if* the director discloses to shareholders, the shareholders consent *and* the use of the corporate opportunity by the director is not detrimental to the corporation. *CST, Inc. v. Mark*, 360 Pa.Super. 303, 520 A.2d 469, 471, *appeal denied*, 517 Pa. 630, 539 A.2d 811 (1987). *See also Robinson v. Brier*, 412 Pa. 255, 194 A.2d 204, 206–08 (1963). CVC disclosed nothing and failed to obtain the consent of Debtor's shareholder to the purchase.

 Even when purchasing claims against a solvent corporation, a director has a heavy burden to establish the fairness of the conduct. *Robinson v. Brier*, 194 A.2d at 206. Appropriation of corporate opportunities by a fiduciary of an insolvent entity, even with approval of the shareholders, directors, and officers, is impermissible when it results in a detriment to creditors. *Brown v. Pres-*

*byterian Ministers Fund*, 484 F.2d at 1005. Detriment is a relative term. In this case, at least two detriments are identifiable. The first befell the selling noteholders who, at the time of sale, were creditors of Debtor and were deprived of the ability to make an informed decision concerning the sale of their claims. If, after full disclosure, they had elected not to sell they would have received a total distribution of $15,989,676.56 rather than the amount paid by CVC of $10,553,-541.88, a difference of more than $5.4 million. If they elected to sell at CVC's price after full disclosure, the harm attendant to them as the result of CVC's nondisclosure would not exist. *See Wolf v. Weinstein*, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). Even were there no harm to the selling noteholders, however, the other creditors were harmed. Debtor negotiated the BDK Plan with its creditors before it filed bankruptcy. CVC was not a prepetition creditor but it acquired enough claims postpetition to control the outcome of a plan and to induce Debtor to propound the "CVC Plan" which competed with Debtor's proposed BDK plan. The CVC plan would have turned over to CVC, through a purchase by a company to be formed by CVC, all of the valuable assets of Debtor. CVC's actions diluted the voting rights of the prepetition creditors by enabling CVC to acquire voting control from several entities, any of which, alone, may have been unable to control the class. This detriment was minimized by CVC's decision not to vote its claim, but creditors nonetheless were forced to incur costs and fees to investigate and challenge CVC's actions and their effects on the class of unsecured claims and seek relief through negotiation or court order—none of which would have been necessary had appropriate and timely disclosures been made. Thus, having failed to meet the first two requirements regarding the use of corporate opportunity, CVC similarly failed to meet the third.

---

**16.** At the hearing on the instant motion, counsel for CVC referred to *In re Marin Town Center*, 142 B.R. 374 (N.D.Cal.1992). The case concerned allowance of a vote on a plan in the context of good and bad faith in purchasing claims. However, there is no indication in the reported decision that the entity which acquired its creditor status by postpetition claims purchases was an insider or a fiduciary of the debtor. Moreover, CVC did not vote on a plan in this case. The case is not apposite to the situation before us.

### V. Respondeat Superior

As a matter of law, Muqaddam was CVC's agent and, under the doctrine of respondeat superior, CVC is liable for Muqaddam's breach of fiduciary duty. *See* § IV, Fiduciary Duty, *supra.* CVC "knowingly permit[ted] its agent", Muqaddam, to purchase claims against Debtor, authorized his actions and provided him with the authority and the means to accomplish the purchase. *Moss v. Elan Memorial Park Corp.,* 400 Pa.Super. 555, 583 A.2d 1254, 1257 (1990). CVC, with knowledge of Muqaddam's dual role, expressly granted to Muqaddam the power and funds with which to purchase the claims and so is bound by Muqaddam's actions. *See Lokay v. Lehigh Valley Co-op. Farmers, Inc.,* 342 Pa.Super. 89, 492 A.2d 405, 409 (1985). Muqaddam was acting within the scope of his employment with CVC in purchasing the claims and his conduct was in furtherance of CVC's business inasmuch as he was charged with the responsibility of monitoring CVC's investments and ensuring their performance. Pennsylvania law dictates that under these circumstances CVC is liable for Muqaddam's conduct. *See Johnson v. Glenn Sand and Gravel,* 308 Pa.Super. 22, 453 A.2d 1048, 1050 (1982) (tort liability). In fact, CVC's liability would exist even if Muqaddam was only partially motivated by a desire to serve CVC's interests. *Shuman Estate v. Weber,* 276 Pa.Super. 209, 419 A.2d 169, 173 (1980).

### VI. Disclosure

Case law under the former Bankruptcy Act warns against the dangers of trading in postpetition claims. Those dangers are present in Bankruptcy Code cases as well. In *Wolf v. Weinstein,* the United States Supreme Court articulated some concerns regarding trading in claims by insiders of an insolvent corporation:

> Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious. The particular dangers may take two forms: On the one hand, an insider is in a position to conceal from other stockholders vital information concerning the Debtor's financial condition or prospects, which may affect the value of its securities, until after he has reaped a private profit from the use of that information. On the other hand, one who exercises control over a reorganization holds a post which might tempt him to affect or influence corporate policies—even the shaping of the very plan of reorganization—for the benefit of his own security holdings but to the detriment of the Debtor's interests and those of its creditors and other interested groups.

*Wolf v. Weinstein,* 372 U.S. at 642, 83 S.Ct. at 975. *Cf. Pepper v. Litton,* 308 U.S. at 307, 60 S.Ct. at 245 (fiduciary obligation exists to protect creditors as well as stockholders). More recently one commentator stated that

> This lack of disclosure has two effects. First, it is detrimental to the efficiency of the market for claims. An efficient market requires that both the buyer and the seller have access to information so that each party to the transaction can be adequately informed. Under Bankruptcy Rule 3001(e), as amended, large sophisticated purchasers of claims, who have the resources and incentives to closely monitor a chapter 11 case, have more information regarding the value of a claim than a small trade creditor, and the small trade creditor has no reasonable means to acquire that information. Second, because only the name of the transferee of record need be disclosed, parties in interest will be unable to ascertain who the real claims buyer is and the intentions of that claims buyer with respect to the control of a debtor.

*Claims Trafficking,* 9 BANKR.DEV.J. at 300 (footnotes omitted). The fact that CVC cannot physically maintain a seat on Debtor's board and must designate a natural person to fill its position, under the facts of this case, does not eradicate the dangers articulated in *Wolf v. Weinstein* and the *Claims Trafficking* article.

The filing of a bankruptcy creates a private market in securities and, without disclosure, creditors are at risk of selling claims "at extraordinary discounts, without understanding their rights". *In re Allegheny Int'l., Inc.,* 100 B.R. 241, 242 (Bankr.W.D.Pa. 1988) (footnote omitted). Muqaddam stated

that "normal market protocol" does not require disclosure of the identity of a buyer when claims are purchased through a broker. Muqaddam Deposition at 165–66, 176, 219–20. However, normal market protocol is not necessarily the applicable standard in a bankruptcy context where disclosure is a fundamental precept. Cf. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. at 357, 105 S.Ct. at 1995 ("by definition, corporations in bankruptcy are treated differently from solvent corporations").

 Much of the Bankruptcy Code is premised on disclosure.[17] For example, a debtor must disclose all of its assets and liabilities, regardless of their contingent or unmatured nature, 11 U.S.C. §§ 521, 101(5), (12), Fed.R.Bankr.P. 1007. A proof of claim filed by a creditor must identify the nature of the claim and supporting documentation must be attached if it exists. 11 U.S.C. §§ 501, 502, Fed.R.Bankr.P. 3001. A plan of reorganization cannot be confirmed without court approval of a disclosure statement containing "adequate information", 11 U.S.C. § 1125, according to the nature of the case and its creditors. In a bankruptcy context, the purchase of claims through or by an insider must be governed by rules which differ from "normal market protocol." It cannot be gainsaid that the selling noteholders' price demands may have been affected by the knowledge that the purchaser had access to inside information concerning the financial affairs of Debtor, its parent and its subsidiaries and that the purchaser could use such information in offering its bid price.[18]

 This situation has none of the earmarks of an arm's length transaction and CVC's failure to disclose its identity and connection with Debtor was inherently unfair to the selling noteholders as well as to the shareholder, which should have had the first opportunity to take advantage of a corporate opportunity, whether or not it had the re-sources to do so. The Committee and Debtor were entitled to know at least the quantity and dollar value of the claims being purchased by CVC, particularly because CVC and Debtor were negotiating with respect to the purchase of Barth & Dreyfuss and Knomark, two subsidiaries of Debtor, as part of Debtor's proposed reorganization plans. Here, Muqaddam, an insider with a fiduciary duty to Debtor was the conduit through which his employer (CVC—a company in which Muqaddam is an officer and which had acquisition designs on Debtor's subsidiaries) purchased claims with absolutely no disclosure to the entities whose interests were affected by these actions.

Cases decided under the Bankruptcy Code express the necessity for the bankruptcy court to exercise its equitable powers and "sift the circumstances surrounding any claim to ensure that injustice or unfairness to creditors does not occur in administration of the bankrupt estate." In re Allegheny Int'l., Inc., 118 B.R. 282, 302 (Bankr.W.D.Pa.1990), citing Pepper v. Litton, 308 U.S. at 307–08, 60 S.Ct. at 245–46. See also In re Allegheny Int'l., Inc., 100 B.R. 241 (Bankr.W.D.Pa. 1988); Matter of Executive Office Centers, Inc., 96 B.R. 642, 649–50 (Bankr.E.D.La. 1988); In re UVAS Farming Corp., 91 B.R. 575 (Bankr.D.N.M.1988). In this case the lack of disclosure created an unfairness in that prepetition noteholders sold their claims in a transaction that was not at arm's length and was not on a "level playing field". The resulting sale was accomplished without the knowledge of sellers of the insider status of the buyer and without benefit to the sellers of access to inside information available to the buyer concerning the estimation of dividends the claim holders could anticipate through a plan—information available to all of Debtor's directors, including Muqaddam.

 CVC argues that it should not be penalized because a member of the Commit-

---

17. "Disclosure is fundamental in a bankruptcy case." Claims Trafficking, 9 BANKR.DEV.J. at 302. "The interest of sellers in having adequate information available for them to make an informed decision and the interest of nonsellers who may find themselves controlled by a third party whose intent would be to minimize the value that goes to the nonsellers are the two interests that need to be protected in control contests." Id. at 304.

18. Whether or not such use actually existed or access to information actually provided the buyer with an advantage via superior knowledge is not dispositive.

tee, Magten Asset Management Corporation, also purchased claims. Magten, however, was not a director. It was Debtor's third largest prepetition creditor and the postpetition claims it purchased accounted for only three per cent of its total investment in Debtor. *See* Stipulation and Order Compromising and Settling Claims, Motion No. 91–9157(B) at Exhibit A. Moreover, Magten disclosed to the sellers its identity and connection with Debtor. Magten settled the causes of action brought against it for claims trading by agreeing to limit its recovery to the amount it paid for the claims, although the settlement included the allowance of the claims at their face value. *See* Stipulation and Order Compromising and Settling Claims, Motion No. 91–9157(b), at 9 ¶ 2.[19] Furthermore Magten's purchases *were on behalf of its customers,* not for its own account. At its customers' direction, Magten also sold claims it held for the benefit of its customers, again disclosing its identity and connection with Debtor to the ultimate purchasers. If CVC had not breached its duties by failing to disclose its activities and the extent thereof to Debtor and the Committee, and its identity and connections with Debtor to the sellers, a different result may have obtained.[20]

## VII. Allowance of the Claim

We now must determine the allowed amount of CVC's claim and the appropriate measure of payment under the plan. The Committee seeks to limit the amount of the claim to what CVC paid for the claims. There are many possible alternatives but three have been argued: (1) allowance of the claims at full face value of the notes purchased; (2) allowance of the claims limited to their actual cost to CVC; or (3) allowance of the claims at full face value of the notes purchased but limitation of recovery under the plan to actual cost with or without interest. For the reasons discussed below, we hold that the claim is allowed at face value but CVC's recovery is limited to the amount it paid for the claims, without interest. We

agree with those cases that hold that insiders cannot purchase claims from a corporation in bankruptcy and enforce the claims at their full value. *See, e.g., In re Bridgford Co.,* 237 F.2d 182, 185 (9th Cir.1956), *cert. denied,* 352 U.S. 1005, 77 S.Ct. 566, 1 L.Ed.2d 550 (1957); *Monroe v. Scofield,* 135 F.2d 725, 728 (10th Cir.1943); *In re UVAS Farming Corp.,* 91 B.R. 575, 577 (Bankr.D.N.M.1988). This limitation removes the unfair advantage to be gained through undisclosed insider status and access to or use of inside information and protects the voting rights of the affected class of creditors. By eliminating the profit, a disincentive to "vulture trading" is established. CVC purchased its claims at a time when it could evaluate the risk of its acquisition to its advantage. It is an improper use of the bankruptcy process for an insider to gain profits from its undisclosed superior access to information whether or not it took advantage of that access, particularly when it is at the expense of prepetition creditors/sellers. By reducing the value of CVC's claim to its actual cost of purchasing the claim, CVC will bear the consequences of its failure to disclose. By limiting the return on CVC's claims there will be an additional distribution to all general unsecured creditors under the plan.

CVC suggests that if its distribution is to be limited, the distribution should not be less than the amount it paid, plus interest. Its argument is that the Bankruptcy Code and the Bankruptcy Act do not provide for damages against an insider who purchases claims of a bankrupt. This argument misses the point. Payment to CVC of the full amount of its allowed, unsecured claim when other unsecured creditors are receiving less is not in accord with the distribution provisions of the Bankruptcy Code. The amount of CVC's recovery will be governed by the distribution provided to the applicable class under the confirmed plan of reorganization, based upon the allowed amount of its claim but capped at CVC's cost of $10,553,541.88. The limitation of the distribution is not a

---

19. 11 U.S.C. § 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment...."

20. The argument that this court cannot deal with this issue pursuant to Federal R.Bankr.P. 3001(e) is without merit. Even as amended in 1991, the bankruptcy court has the power under the Rule to adjudicate disputes regarding claims transfers.

damage award to any other party. It is a determination of Debtor's liability to CVC. Furthermore, CVC is not entitled to payment of interest. No other creditors in CVC's class will receive interest under the plan and there is no basis for providing special treatment to CVC's claim. Indeed, to do so would violate § 1123(a)(4) of the Bankruptcy Code which prohibits disparate treatment among class members.[21] *Cf. United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (interest allowed on oversecured claims if certain conditions exist). Furthermore, limiting CVC's distribution will create a disincentive to engage in similar behavior by others in the future when the transaction is not at arm's length and is brought about by or involves insiders who fail to make sufficient disclosure to the appropriate parties.

### VIII. Conclusion

The parties argue for and against the existence and/or application of a *per se* rule which limits the allowance of claims purchased postpetition in circumstances such as those at bench. It may be that nondisclosure will not subject an insider who purchases claims to censure in some situations. *See, e.g., In re Federated Dept. Stores, Inc.,* 1991 WL 79143 (Bankr.S.D.Ohio, March 7, 1991) (procedures to safeguard various interests). Therefore, we do not grant partial summary judgment on the basis of a *per se* rule as the Committee asks. However, we find that no material disputed facts exist and, as a matter of law, CVC is an insider whose breach of fiduciary duty, failure to disclose, and self-dealing compel the limitation imposed herein on the distribution to be made on its allowed claim.

The issue of equitable subordination raised in the complaint is not before the court on this motion for partial summary judgment. Therefore, an order will be issued scheduling a conference on that issue.

An appropriate Order will be entered.

---

21. Section 1123(a)(4) of the Bankruptcy Code provides: "(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or

### ORDER

And now, to-wit, this **22nd** day of **April, 1994,** for the reasons set forth in the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED AND DECREED** that the motion of the Committee of Creditors Holding Unsecured Claims and Committee of Creditors Holding Unsecured Claims, as Estate Representative of Papercraft Corporation, Plaintiffs, seeking partial summary judgment is **GRANTED.** CVC's claim is allowed as a general unsecured claim in the amount of $60,849,299.10. However, CVC's distribution pursuant to the confirmed plan of reorganization is limited to its cost to purchase the claims, i.e., $10,553,541.88. The $60,849,-299.10 represents $34,725,575.72 in First Priority Notes and $26,123,723.38 in Second Priority Notes.

A status conference will be held on **April 25, 1994,** at **1:00 p.m.** as previously ordered.

interest." CVC's request to have interest added to its allowed claim would give it preferential treatment, not the "less favorable treatment" authorized, upon consent, by the statute because no other creditor in CVC's class will be paid interest.