IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1991
Summary Calendar
_____


IN THE MATTER OF:  PAT S. HOLLOWAY,

Debtor.

BROWNING INTERESTS,

Appellants,

versus

LINDA W. ALLISON,

Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(March 23, 1992)

Before JOLLY, DAVIS, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Browning Interests[1] appeal from the district court's

judgment affirming the judgment of the bankruptcy court which

_____

[1]Jane H. Browning, individually and as Co-Independent
Executrix of the Estate of William W. Browning, Jr., Deceased;
Michael G. Starnes, individually and as Co-Independent Executor of
the Estate of William W. Browning, Jr., Deceased, and as Trustee
for Katherine Louise Browning Cook, Averille Adams Browning Dawson,
William Webb Browning, III, Winifred Fallon Browning Vaughn, and
Robert Holland Browning; Katherine Agnes Land Starnes,
individually; Katherine Louise Browning Cook, individually;
Averille Adams Browning Dawson, individually; William Webb
Browning, III, individually; Winifred Fallon Browning Vaughn,
individually; and Robert Holland Browning, individually.

refused to set aside as a fraudulent conveyance the transfer of a security interest from the Debtor, Pat S. Holloway ("Holloway") to one of his ex-wives, Linda W. Allison ("Allison"). Under a correct application of the law, the evidence can only support the conclusion that Allison is an insider; therefore, the transfer of the security interest is voidable as a fraudulent conveyance. Accordingly, we reverse the judgment of the district court, vacate the judgment of the bankruptcy court, and remand the case for entry of judgment in favor of the Browning Interests in accordance with this opinion.

I

Allison and Holloway were married to each other for twenty years, from 1949 to 1969, and have three children in common. On November 11, 1979, Holloway filed a Chapter 11 reorganization case, which was converted to a Chapter 7 liquidation case in 1982. Beginning January 5, 1984, and continuing through February 7, 1989, Allison loaned him $326,337.05, initially without any collateral. According to Allison, the loans were made "to provide for his sustenance and living expenses incurred due to the financial hardship brought upon Holloway by his lengthy bankruptcy proceedings."

In 1986, Holloway obtained a judgment for approximately $1,400,000 ("the HECI Judgment") against the HECI Exploration Company Employees' Profit Sharing Plan ("the Plan"). On February 5, 1987, Holloway executed a Collateral Assignment and Security

Agreement in favor of Allison granting a security interest in the HECI Judgment.

Because there were numerous claims to the proceeds of the HECI Judgment, the Plan filed an adversary proceeding interpleading the funds into the registry of the bankruptcy court. The claimants initially included Holloway's second wife, Robbie Holloway, and the Internal Revenue Service. The Browning Interests, who hold a $72,000,000 judgment against Holloway, also actively participated in the proceedings before the bankruptcy court.

In addition, Holloway made several unsuccessful attempts to obtain the funds. First, he attempted to have the bankruptcy court disburse the funds to him in satisfaction of his alleged pro se attorney's fees. He then attempted to have the funds declared his exempt property under Texas law. Next, he tried to have the funds declared the community property of his marriage to his third and current wife, Brenda Holloway, and to obtain enforcement of an alleged partition agreement. Holloway later voluntarily dismissed his claim based on the alleged partition agreement.

On February 27, 1989, the Government filed a motion for relief from the automatic stay so that it could file tax liens and levy on the funds in the registry of the bankruptcy court. On March 21 and 22, 1989, Allison caused financing statements to be filed, perfecting her security interest in the HECI Judgment. Although Allison was aware of the claims of the Browning Interests and the Government, as well as Holloway's efforts to obtain the funds, she

made no effort to assert her claim to a portion of the funds until she filed her Motion to Determine Status of Claim on March 31, 1989. Shortly thereafter, Holloway, in his role as Trustee of his children's trusts, asserted a claim to $284,892.46 of the funds, plus interest and attorney's fees, pursuant to an alleged security agreement dated February 5, 1987, recorded on April 19, 1989, securing loans allegedly made by the trusts to Holloway.

On May 8, 1989, the United States filed four Notices of Federal Tax Liens against Holloway totaling $4,433,176.48.

## II

The case was tried in bankruptcy court to determine the validity and priority of Allison's claim to the proceeds of the HECI Judgment. The bankruptcy court entered judgment in favor of Allison in the amount of $364,346.47, plus additional interest and attorney's fees, to be paid out of the funds on deposit in the registry of the court. The bankruptcy court's judgment was affirmed by the district court. Disbursement of the funds was stayed pending appeal. The Browning Interests and the Government appealed from the district court's judgment, but the Government settled with Holloway and dismissed its appeal.

## III

The Browning Interests contend that the collateral assignment to Allison is avoidable as a fraudulent conveyance under Tex. Bus. Com. Code Ann. § 24.006(b), and that the bankruptcy and district courts erred in holding that Allison was not an "insider."

-4-

The bankruptcy court's findings of fact "will not be set aside unless clearly erroneous." <u>Matter of Delta Towers, Ltd.</u>, 924 F.2d 74, 76 (5th Cir. 1991). However, "when a finding of fact is premised on an improper legal standard, that finding loses the insulation of the clearly erroneous rule." <u>Matter of Fabricators, Inc.</u>, 926 F.2d 1458, 1464 (5th Cir. 1991). "Conclusions of law, on the other hand, are subject to plenary review on appeal." <u>Id</u>.

Transfers made after September 1, 1987 are governed by the Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. §§ 24.001, <u>et</u> <u>seq</u>. (West 1987). The transfer at issue is Holloway's granting of the security interest to Allison, which is deemed to have been made when it was filed of record so as to be perfected. Tex. Bus. & Com. Code Ann. § 24.007(1)(B). Section 24.006(b) provides:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

The record establishes, and the bankruptcy court found, that: (1) the Browning Interests' claims arose prior to the transfer,[2]

---

[2]Allison contends that the Browning Interests have not satisfied their burden of proof under § 24,006(b) because they introduced no evidence to prove their status as a present creditor of Holloway whose claim arose before the transfer was made. Allison made no such contention before the bankruptcy court, and that court found that, with the exception of Allison's status as an insider, all of the elements of § 24.006(b) were satisfied. It is clear and undeniable from the record that the Browning Interests' have a $72,000,000 judgment against Holloway and that their status

(2) the transfer was for an antecedent debt, (3) Holloway was insolvent at the time of the transfer, and (4) Allison knew that Holloway was insolvent. Therefore, the only disputed issue is whether Allison is an "insider". Section 24.002(7) defines an "insider" as follows:

> (7) "Insider" *includes*:
>
>     (A) if the debtor is an individual:
>
>         (i) a relative of the debtor or of a general partner of the debtor;
>
>         (ii) a partnership in which the debtor is a general partner;
>
>         (iii) a general partner in a partnership described in Subparagraph (ii) of this paragraph; or
>
>         (iv) a corporation of which the debtor is a director, officer, or person in control.

Tex. Bus. Com. Code Ann. § 24.002(7) (emphasis added).

The bankruptcy court held that Allison was not an insider, apparently because she did not fit within one of the four categories listed in the statute:

> Allison was an ex-wife of twenty years whose only substantial contact with Debtor was to provide him with funds to help defray living and legal expenses. "Insider" is *narrowly defined* in § 24.002(7). Allison is not a "relative" under the definition of § 24.002(11) or under Texas law because divorce terminates the marital relation. Allison is not an insider; thus, Uniform Fraudulent Transfer Act § 24.006(b) does not apply.

_____

as a present creditor whose claim arose prior to the transfer at issue.

Memorandum Opinion at 5 (citation omitted; emphasis added). The bankruptcy court's finding was based upon an erroneous interpretation of the law. As the Texas Court of Appeals in Dallas recently made clear, the UFTA's definition of "insider" is not intended to limit an insider to the four listed subjects. Instead, "the drafters provided the list for purposes of exemplification." J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson, 805 S.W.2d 16, 18 (Tex. App.--Dallas 1991, no writ).

The UFTA's definition of "insider" is very similar to the definition in the Bankruptcy Code, 11 U.S.C.A. § 101(31) (West Supp. 1991), and both parties agree that cases interpreting § 101(31) are instructive. Collier on Bankruptcy states that "[a]n `insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny." 2 Collier on Bankruptcy ¶ 101.31 at 101-87 (15th ed. 1991). The legislative history of § 101(31) defines an insider as a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S. Rep. No. 95-989, 95th Cong. 2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5810.

The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee

and the debtor were conducted at arm's length.  E.g., In re Friedman, 126 B.R. 63, 70 (9th Cir. B.A.P. 1991) ("insider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain advantage attributable simply to affinity rather than to the course of business dealings between the parties"); In re Schuman, 81 B.R. 583, 586 (9th Cir. B.A.P. 1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor."); In re Benson, 57 B.R. 226, 229 (Bankr. N.D. Ohio 1986) (an insider may be anyone "whose close relationship with the debtor subjects transactions made between the two parties to careful scrutiny"); Matter of Lemanski, 56 B.R. 981, 983 (Bankr. W.D. Wis. 1986) (a transferee is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arms-length"); Matter of Montanino, 15 B.R. 307, 310 (Bankr. D.N.J. 1981) (an insider "is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arm's-length transaction").

The following undisputed facts demonstrate the closeness of the relationship between Holloway and Allison, which requires "careful scrutiny" of the subject transactions:

1. They were married to each other for twenty years and had three children in common.

2. They maintained "frequent" contacts with one another after their divorce. Allison testified:

> Q. During the twenty years since you divorced Mr. Holloway, how often have you had contact with him?
>
> A. Well, I don't really -- I mean often enough that it is difficult to say. Frequently.

3. Holloway wanted to protect Allison and keep her from becoming embroiled in the bitter controversy between him and the Browning Interests.[3] At a hearing on February 27, 1989, Holloway testified that his third and current wife, Brenda, had borrowed money from Allison; however, Brenda did not sign the promissory notes. Holloway did not mention that the loans from Allison were secured by any collateral. At that same hearing, when Holloway was questioned on cross-examination about Allison, he was evasive. Before reluctantly admitting that she was his first wife and the "mother of my children," he first stated that "[s]he is the widow

---

[3]This court has likened that controversy to the feud between "the Hatfields and the McCoys." Browning v. Navarro, 887 F.2d 553, 554 (5th Cir. 1989).

of Mr. Jimmy Allison"; and when asked about their relationship, Holloway replied, "She has an old friend relationship." Finally, he acknowledged that she was his former wife. At the hearing on Allison's motion, Holloway stated:

> I was trying to keep my first wife [Allison] from being involved in the warfare between the Brownings and me. And that's the reason that they have not presented a claim prior to now, I think.

4.    Allison also desired to "protect Holloway; she characterized herself and Holloway together as victims of a "siege," and testified that they tried to "protect each other."

5.  Despite Allison's desire to avoid getting involved in the controversy between Holloway and the Browning Interests, the record indicates that she was keenly interested in that litigation and strongly supported Holloway's position. In addition to helping finance Holloway while he pursued the Browning litigation, she admitted that she had sat in the back of the courtroom a few times during hearings.

6.  The closeness of the relationship between Holloway and Allison is succinctly illustrated by her response to cross-examination as to why she made the loans to Holloway when she knew that he was insolvent:

> [I]t's very hard to describe to you what this ten years of litigation and the untrue allegations that have been made against Pat have done to my children. My daughter Marcie was paralyzed in an automobile accident on the night of the day that she read those allegations for the first time. There is nothing strange about two sane people coming together and cooperating in any way they can

-10-

in the aftermath of a tragedy like that.

Contrary to Allison's characterization, we see no "paranoia" in the Browning Interests' supposition that Allison sought to assist Holloway in continuing his expensive litigation crusade against them because she blames them for the injury to her child.

B

Because of the closeness of the relationship between Allison and Holloway, we turn to give our careful scrutiny to the subject transactions. The following undisputed facts lead us to conclude that the transactions between Allison and Holloway were not conducted at arm's length:

1. The loans were initially unsecured by any collateral. (Allison testified that she anticipated being repaid when Holloway prevailed, as she hoped he would, against the Browning Interests.) See In re Standard Stores, Inc., 124 B.R. 318, 325 (Bankr. C.D. Cal. 1991) (making a significant loan on an unsecured basis and without inquiring into the debtor's ability to repay the loan, is a significant factor in determining whether a transaction was conducted at arm's length).

2. Allison knew that Holloway was insolvent, both at the time she made the loans and at the time she received and recorded the security agreement. Although Allison was aware of Holloway's successive attempts to get his hands on the funds, as well as the competing claims to the funds made by others, including the United States, the Browning Interests, and Robbie Holloway, she did not

-11-

perfect the purported security interest or assert her claim until March 1989, after the United States sought relief from the automatic stay.

3. The loans were not commercially motivated; Allison testified that her motivation for the loans stemmed from the damage that the lengthy litigation with the Browning Interests had caused to her children. No prudent lender would have made such loans to an insolvent Chapter 7 debtor in Holloway's circumstances. We also note the unusual circumstance that although Allison testified that funds were advanced to Holloway either by check or wire transfer, she introduced no cancelled checks or other evidence that funds were actually advanced.

4. Holloway, who had no apparent reason or standing to become involved in the priority dispute between Allison and other claimants, did not remain disinterested--instead, the record clearly reveals that he sided with Allison. In his response to her motion to determine the status of her claim, he "acknowledge[d] that the security interest held by Allison is valid, perfected and entitled to priority to any other competing claims against the collateral." Holloway also filed a motion to dismiss the cross-action of the Browning Interests against Allison and the fraudulent conveyance defenses of the United States to her claim.

V

Allison contends that she is not an insider even under an expansive interpretation of that term. She relies upon In re

Schuman, 81 B.R. 583 (9th Cir. B.A.P. 1987), an action by the trustee to set aside as a preference the debtor's transfer of a community property residence to his ex-wife. The court concluded that the ex-wife was not an insider, stating:

> Although it is true that the parties had been married for nineteen years, and the Debtor had expressed a desire that his children be well provided for, these facts do not indicate that Mrs. Schuman was able to exert sufficient influence over the Debtor to render her an insider. Rather, the facts that the Debtor was remarried at the time of the transfer and that his relationship with Mrs. Schuman was hostile, suggest that she was unable to exert control over the Debtor in his financial decisions. The negotiations between the Debtor and Mrs. Schuman were adversarial in nature. In fact, Mrs. Schuman had previously pursued the Debtor in court to get child support payments and both parties had retained counsel to represent their interests. Thus, it is clear that the Debtor was not volunteering payment on his child support obligation. These factors suggest that the transaction was, indeed, arms-length. Accordingly, we conclude that the trial court correctly determined that Mrs. Schuman did not exert the necessary degree of control or influence to render her an insider.

81 B.R. at 586. Although Schuman is certainly illustrative, it is distinguishable in several important respects. First, the record contains no evidence of any recent hostility, certainly none at the time of the transfer, between Allison and Holloway. On the contrary, their relationship, as depicted by the record, was quite cordial from 1984 onward; a hostile ex-wife would hardly lend money to her ex-husband. Second, the factors listed in part IV B above suggest that the transactions between Holloway and Allison were conducted at anything but arm's length.

Allison also urges us to examine the criteria utilized by the Texas Court of Appeals in Putman to make its determination that the wife's physician was an insider:

> A review of the evidence reveals that Putman had a close personal relationship with both Husband and Wife. Both families engaged in social activities together, such as hunting. Putman also maintained a business relationship with both Husband and Wife. Putman was Wife's personal physician and he delivered the two children of Husband and Wife. As noted earlier, Wife discussed the financial difficulties she and Husband were experiencing during her doctor's appointment with Putman. She also asked Putman to help her convince Husband to seek treatment for his alcoholism. Putman and Husband entered into several business deals together. For example, they entered into a hunting lease together, they jointly purchased the property in question and discussed the possibility of growing hay on this property, and they discussed investing in a restaurant together. In light of his personal knowledge of the business, financial, and personal affairs between Husband and Wife, we conclude that Putman was an insider under UFTA with respect to the conveyance of the Kaufman County property.

805 S.W.2d at 18-19. Allison contends that there was no evidence that she and Holloway have any type of "special relationship" or "close personal relationship," based upon the following factors: (1) she lived in Dallas and Holloway lived in Giddings, Texas; (2) all contacts between her and Holloway were made by telephone, with one exception consisting of a meeting in her attorney's office at which her attorney negotiated a loan transaction; (3) both parties have remarried twice since their divorce; (4) there is no evidence of any ongoing social relationship; (5) there is no evidence of any business relationship outside of the loan transactions; (6)

-14-

Holloway, a lawyer, has never represented Allison; and (7) their relationship was hostile in the past, as evidenced by an appeal from a lengthy custody battle, Holloway v. Allison, 494 S.W.2d 612 (Tex. Civ. App. -- Tyler 1973, no writ).

We do not think that the facts that Holloway and Allison lived in different locations and negotiated nearly all of the loan transactions by telephone support Allison's contentions; instead, those facts are further evidence that tell us that the transactions were not commercially motivated and were not conducted at arm's length. Surely, an arm's length, commercially motivated lender simply would not have made such undocumented loans to an insolvent and without security under these informal and careless circumstances.

The fact that both parties have remarried twice since their divorce only highlights the extraordinary nature of both their continued relationship and the generous and casual loan transactions. Although there is little evidence of a social relationship between Holloway and Allison, the record reveals the existence of a committed personal and even emotional relationship, as evidenced by Allison's characterization of herself and Holloway as joint victims of a "siege," which was largely his fight, and by the bond between them resulting from their daughter's tragic accident.

Furthermore, the circumstances of the loan transactions constitute evidence of a business relationship, albeit an unusual

one for ex-spouses.  We agree that there is no evidence of an attorney-client relationship between Holloway and Allison, but she testified that Holloway prepared the collateral assignment and security and agreement, as well as other documents evidencing the loan transactions.

Finally, it is irrelevant that Holloway and Allison might have been hostile toward one another at the time of their divorce and during the custody battle which ended in 1973, eleven years before the first loan was made.  Any such hostility clearly had dissipated and certainly did not exist at the time Allison perfected her security interest.

We agree that there is no evidence that Allison exerted direct control over Holloway's financial affairs; further, she is correct in her assertion the mere lending of money is not sufficient to impute insider status to a lender.  However, the closeness of the relationship between Allison and Holloway, together with the unusual circumstances of the loan transactions, support an inference that Allison was in a position to exert influence over Holloway, as evidenced by his support for her position in the priority dispute to which he was not a party.  Although an examination of the amount of control a lender has over a debtor's day-to-day activities is very important in the context of commercial loan transactions, such an analysis is much less relevant in situations like the present one, involving loans made with no commercial motivation.

Allison repeatedly stresses that the transactions were "real loans of real money evidenced by real notes and a real security agreement."  We do not disagree; however, the transfer at issue under the UFTA is not the loans, but the granting of the security interest in the HECI Judgment.  Holloway's liability to Allison on the notes is not at issue.

In conclusion, Allison's arguments that she is not an insider simply will not support such a conclusion against the overwhelming and undisputed evidence to the contrary.

VI

Courts that have considered the issue, albeit in somewhat different contexts, have concluded that the determination of insider status is a question of fact.  E.g., Matter of Missionary Baptist Foundation of America, 712 F.2d 206, 210 (5th Cir. 1983); In re Friedman, 126 B.R. 63, 67 (9th Cir. B.A.P. 1991); In re Hydraulic Industrial Products Co., 101 B.R. 107, 109 (Bankr. E.D. Mo. 1989).  Cf. In re Schuman, 81 B.R. at 586 n.1 ("[W]here the underlying facts are undisputed, a trial court is free, on a motion for summary judgment, to determine whether the established facts satisfy the statutory standard.  In this sense, it would be more accurate to consider the insider determination as a mixed question of law and fact.")  Although it would appear to us that once the underlying facts are resolved, insider status ultimately is question of law, we need not address that prickly problem.

The bankruptcy court found that Allison's "only substantial

-17-

contact with [Holloway] was to provide him with funds to help defray living and legal expenses," and concluded that she was not an insider.[4]  However, because that finding was based upon an incorrect, narrow interpretation of the statute, it is not subject to the "clearly erroneous" standard of review.  See Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501 (1984) ("Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.").  Because the bankruptcy court made no findings applying the correct legal standards, we ordinarily would remand the case for a new determination of Allison's status based upon the proper interpretation of the law.  However, "it is settled that findings are not jurisdictional and the appellate court may decide the appeal without further findings if it feels that it is in a position to do so."  9 C. Wright & A. Miller, Federal Practice & Procedure, §2577 at 699-70 (1971).  We are in a position to do so in this case and on this record, where the underlying facts are undisputed, where there are no credibility resolutions to be made, and where no view of the record would permit a finding that Allison was not an insider.  See Tomlin v. Ceres Corp., 507 F.2d 642, 648

---

[4]It appears to us that the fact that Allison was willing to support Holloway personally and to help finance his litigation with the Brownings demonstrates the closeness of their relationsip and, consequently, militates in favor of insider status.

(5th Cir. 1975) (where the only factual finding supportable by the record was that Ceres Ranches was not a party to an agreement, a remand was not necessary; "[s]uch a finding, if the trial judge had made it, would be clearly erroneous"); Smithkline Diagnostics v. Helena Laboratories Corp., 859 F.2d 878, 886 n.4 (Fed. Cir. 1988) (remand is unnecessary when "as a matter of law, the court could only make one finding of fact or decide the fact in only one way. Otherwise, protracted litigation and unnecessary delay and expense would occur.").[5]

We believe that a remand for a new determination of Allison's status based upon the proper interpretation of the law would be only a hollow ritual. The undisputed, established facts can only support one inescapable conclusion: Allison was an insider at the time of the transfer. Any other finding would be clearly erroneous. Therefore, the transfer of the security interest from Holloway to Browning should have been set aside as a fraudulent conveyance pursuant to Tex. Bus. & Com. Code Ann. § 24.006(b). We

---

[5] See also Matter of Legel, Braswell Gov't Securities Corp., 648 F.2d 321, 327 n.8 (5th Cir. 1981) (remand for finding of fact on whether party acted in good faith unnecessary where "a complete and fair resolution of this issue may be made from the record on appeal and that . . . record as a whole reflects that there was no genuine issue of material fact regarding Irving Trust's good faith"); Adams v. Agnew, 860 F.2d 1093, 1097 (D.C. Cir. 1988) (remand for finding on question of whether party had reasonable time for performance of contract unnecessary because decision of appellate court "based on undisputed historic facts contained in the record"); Otto v. Variable Annuity Life Ins. Co., 814 F.2d 1127, 1138 & n.11 (7th Cir. 1986), cert. denied, 108 S.Ct. 2004 (1988) (in the interest of judicial economy, remand is unnecessary where issues are clear and turn on undisputed facts in the record).

see no compelling reason to subject the parties and the courts to further delays and expense by remanding the case for application of the proper legal standard to the undisputed facts.  Accordingly, we REVERSE the judgment of the district court, VACATE the judgment of the bankruptcy court, and REMAND the case to the district court for the entry of judgment against Allison and in favor of the Browning Interests in accordance with this opinion.

REVERSED AND REMANDED.