CLIFTON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the legal conclusion that a person does not necessarily become a statutory insider solely by acquiring a claim *1004 from a statutory insider, as discussed in section III.A of the majority opinion. As long as the interest previously owned by a statutory insider was acquired by an independent party, for bona fide reasons, uninfected with the unique motivations of the insider, there is no reason that the insider taint should always be unshakeable. The consideration of whether the insider status should stick to the interest properly depends on the particular circumstances and is appropriately treated as something to be determined based on the facts of the situation. But it is clear to me, based on the facts of this case, that Robert Rabkin should be viewed as a non-statutory insider, and the bankruptcy court should treat his claim as such. I respectfully dissent as to Section III.B.
The majority opinion, at 1001, defines a creditor as a non-statutory insider when “(1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm’s length.” I agree.
The facts make it clear that this transaction was negotiated at less than arm’s length. Rabkin paid $5,000 to MBP (the sole member of the debtor, Lakeridge), for an unsecured claim against Lakeridge nominally worth $2.76 million. MBP did not offer the interest to anyone else. The purchase was not solicited by Rabkin. It was proposed to Rabkin by Kathie Bartlett, a member of the MBP board. There was no evidence of any negotiation over price—Rabkin didn’t offer less, and MBP didn’t ask for more. Rabkin knew little if anything about Lakeridge (or, for that matter, MBP) before he bought the claim, nor did he conduct any investigation to ascertain the current value of that unsecured claim. Even after he purchased the claim, he did not bother to find out more about what it might be worth. Prior to his deposition Rabkin did not even know what the proposed plan of reorganization would pay him for the claim. After he learned that the payment under the plan would be $30,000, he was offered as much as $60,000 for his interest, but he declined that offer.[1]
The motives of MBP and Bartlett are clear and not denied. MBP is the sole member of Lakeridge. The Lakeridge reorganization plan cannot be approved unless there is a class of creditors willing to vote to approve it. Without the sale of this claim to Rabkin and his anticipated vote to approve the plan, that plan is dead in the water, Lakeridge will be liquidated, and there will be no hope for MBP to obtain anything for either the unsecured claim or, more importantly, its ownership of Lakeridge. It may have wanted to recover something from its unsecured claim, but it did not look for the best possible price because its Lakeridge ownership was far more important. MBP was primarily motivated to place the unsecured claim in the hands of a friendly creditor who could be counted on to vote in favor of the reorganization plan, opening the door to the possibility of obtaining approval of the proposed plan of reorganization.
Rabkin’s motivation is a bit murkier, but it is clear that the transaction cannot be understood as a primarily economic propo *1005 sition on his part. There was no evidence that he had a habit of making blind bets, say by helping out Nigerian princes or buying the Brooklyn Bridge. There is an alternative explanation that makes a lot more sense. As the majority opinion acknowledges, at 997, Rabkin had a “close business and personal relationship” with Bartlett, the person who proposed this transaction to him. I don’t have to know the precise details of the relationship between Rabkin and Bartlett to conclude that it offers the only logical explanation for Rabkin’s actions here. He did a favor for a friend, and if it made some money for himself, so much the better.
Rabkin may not have been setting out to lose money or planning simply to give $5,000 to Bartlett, but that is not the standard. Black’s Law Dictionary (10th ed.2014) defines “arm’s length transaction” as follows:
1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.
Rabkin and Bartlett were not “unrelated and unaffiliated parties.” The transaction was not conducted “as if the parties were strangers.” It was not an arm’s length transaction. As a result, under the definition recognized by the majority, Rabkin was a “non-statutory insider” because “the relevant transaction [was] negotiated at less than arm’s length.”
Rabkin at no point attempted to negotiate the price of his purchase, research the value of the claim that was offered to him, or otherwise behave in a manner that suggests that he took his acquisition seriously as an economic investment. This “compels the conclusion” that Rabkin and Bartlett’s relationship was “close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties.” In re Kunz, 489 F.3d 1072, 1079 (10th Cir.2007) (quoting In re Enter. Acquisition Partners, Inc., 319 B.R. 626, 631 (9th Cir. BAP 2004)); see also, Matter of Holloway, 955 F.2d 1008, 1011 (5th Cir.1992).
Moreover, though the majority opinion treats the bankruptcy court’s determination that Rabkin was not a non-statutory insider as a factual finding subject to review only for clear error, I do not think that reflects a correct understanding of what the bankruptcy court decided. The specific facts of the episode were not seriously contested. Rather, the majority simply accedes to the bottom-line adjudication that, based on those facts, Rabkin was not an insider.
But that finding turns at least as much on the legal standard that defines a non-statutory insider as it does on the facts. Look at what the bankruptcy court said in explaining its conclusion that Rabkin was not a non-statutory insider, quoted by the majority opinion, at 998:
(a) Dr. Rabkin does not exercise control over [Lakeridge; ](b) Dr. Rabkin does not cohabitate with Ms. Bartlett, and does not pay [her] bills or living expenses; (c) Dr. Rabkin has never purchased expensive gifts for Ms. Bartlett; (d) Ms. Bartlett does not exercise control over Dr. Rabkinf;] (e) Ms. Bartlett does not pay [Dr.] Rabkin’s bills or living expenses; and (f) Ms. Bartlett has never purchased expensive gifts for Dr. Rabkin.
This list of facts would support a finding that Rabkin and Bartlett are separate financial entities, but it does not show that this transaction was conducted as if they were strangers. At no point does the bankruptcy court mention or refer to an “arm’s length transaction” at all, let alone provide a sufficient basis for a finding that Rabkin and Bartlett were unrelated or *1006 dealt with each other as strangers. That is the standard the majority opinion and I both agree should apply, but it was not the standard actually applied by the bankruptcy court. The majority disagrees, stating, at 1003 n. 15, that the bankruptcy court’s order “is a description of why the transaction was conducted at arm’s length,” but the majority opinion is conspicuously silent in explaining how the facts actually justify any such finding.
That tells me that the problem here is not with the facts as found by the bankruptcy court but with the legal test that the bankruptcy court applied. What standard did the bankruptcy court apply to determine whether this transaction was conducted at arm’s length, by, parties acting like they were strangers? We don’t know, because the bankruptcy court order never discussed the concept. At a minimum, this ¡makes.Rabkin’s status a mixed question of law and fact, subject to de novo review. See In re Bammer, 131 F.3d 788, 792 (9th Cir.1997) (“Mixed questions presumptively are reviewed by us de novo because they require consideration of legal concepts .and the exercise of judgment about the values that animate legal principles.”).
I do not need to pursue that question further here, though, because even if the clear error standard applies, the finding that Rabkin was not a non-statutory insider cannot survive scrutiny. The majority opinion states three separate times, at 1002, 1002 n. 14 & 1003, that we cannot reverse under the clear error standard simply because we would have decided the case differently, a telling sign that even the majority recognizes that support for the finding is thin at best. It even suggests, at 1002 n, 14, that this dissent presents nothing more than a statement of how I would .have decided the case sitting as a bankruptcy judge. But my dissent is based on far more than a mere alternative view of the evidence. I cannot fathom how anyone could reasonably conclude that this transaction was conducted as if Rabkin and Bartlett were strangers. The clear error standard is not supposed to provide carte blanche approval of whatever the bankruptcy court might have found. That is especially true here, where the bankruptcy court never actually stated a finding that the transaction was at arm’s length or that the parties conducted the transaction as if they were strangers. Under the proper definition of “arm’s length transaction,” Rabkin’s acquisition of the claim was a transaction “negotiated at less than arm’s length.” He was a non-statutory insider, and his claim should be' treated as such.
The majority’s holding also has the troubling effect of creating a clear , path for debtors who want to avoid the limitations the Bankruptcy Act places on reorganization plans. The Act allows courts to confirm bankruptcy plans if each class of claims or interests impaired under the plan votes to accept the plan. 11 U.S.C. § 1129(a)(8). Perhaps recognizing that unanimous agreement on a given bankruptcy plan would sometimes prove impossible, Congress also created an exception to § 1129(a)(8) allowing, debtors to “cram down” a bankruptcy plan over the objections of some debtor classes. The cram-down provision allows courts to approve a bankruptcy plan so long as all provisions of. § 1129(a) are met except for § 1129(a)(8), and the proposed plan is fair, equitable, and does not discriminate unfairly. 11 U.S.C. § 1129(b)(1). Even in the case of a cramdown, though, “at least one class of claims that is impaired under the plan [must have] accepted the plan, determined without including any acceptance of the plan by any insider.” 11 U.S.C. § 1129(a)(10).
The legislative history on § 1129 is sparse and provides little insight into Con *1007 gress’s motives,[2] but in accordance with one of the most basic tenets of statutory interpretation, we must “interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.” Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427, 1432 (9th Cir.1991). Here, we are obligated to interpret § 1129 as a whole and in a way that gives each of its provisions meaning. A cramdown plan cannot be approved unless it is accepted by at least one class of impaired creditors.
Yet the majority opinion effectively renders that statutory requirement meaningless. Under the holding here, insiders are free to evade the requirement simply by transferring their interest for a nominal amount (perhaps a few peppercorns) to a friendly third party, who can then cast the vote the insider could not have cast itself.
Contrary to the majority’s assurances, the requirement that all votes be cast in good faith is not a check on this behavior. In the memorandum disposition issued alongside this opinion, we conclude that Rabkin’s vote for the plan was cast in good faith because Appellants had not proven that he had “ulterior motives” for his vote to approve the plan beyond personal enrichment. By this standard, a savvy debtor can comply with the good faith requirement by following a simple formula: develop a reorganization plan that would provide a payout on the insider claim if approved, and then sell the claim to a friendly third party for a price lower than the payout. This enables the debtor to maneuver the third party into a position where it would be foolish not to vote for approval of the reorganization plan, ensuring a “yes” vote and thereby allowing the debtor to effectively avoid the requirement under § 1129(a)(10) that at least one non-insider must approve the plan.
Congress cannot have intended this outcome. If it had, it would not have required that at least one class of impaired creditors—excluding insiders—vote for a plan before it can be approved. Our holding here effectively negates that part of the statute.
I respectfully dissent.

. The offer was made in a crude manner at Rabkin’s deposition by the attorney for U.S. Bank. The manner in which the offer was presented and the demand for an immediate response weighs against putting much weight on Rabkin’s rejection of the offer. Even after reflection and consultation with his counsel, however, Rabkin declined the offer and did nothing to pursue any opportunity to realize more than $30,000 for his interest. That behavior does not support the view that his motivations were purely economic or that his decision-making was that of a parly acting at arm’s length without regard for his personal relationship with an insider.

. As the Fifth Circuit has noted, "the scant legislative history on § 1129(a)(10) provides virtually no insight as to the provision’s intended role.” In re Vill. at Camp Bowie I, L.P., 710 F.3d 239, 246 (5th Cir.2013) (citing National Bankruptcy Conference, Reforming the Bankruptcy Code: The National Bankruptcy Conference’s Code Review Project 277 (1994) (noting that the legislative history of § 1129(a)(10) "is murky, shedding little light on its intended role”); Scott F. Norberg, Debtor Incentives, Agency Costs, and Voting Theory in Chapter 11, 46 U. Kan. L.Rev. 507, 538 (1998) (noting that "[t]he legislative history ... sheds little light on the rationale for section 1129(a)(10)”)).