# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 30, 2022

Lyle W. Cayce
Clerk

No. 21-10212

IN THE MATTER OF:  SILVER STATE HOLDINGS, ASSIGNEE 7901
BOULEVARD 26, L.L.C.

*Debtor*,

RICHARD N. MORASH; SILVER STATE HOLDINGS, ASSIGNEE
7901 BOULEVARD 26, L.L.C.,

*Appellants/Cross-Appellees*,

*versus*

VALLEY RIDGE ROOFING AND CONSTRUCTION, L.L.C.,

*Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-1355

Before JONES, HAYNES, and COSTA, *Circuit Judges*.

PER CURIAM:*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 21-10212

Richard Morash owned a property encumbered by liens. He erased one of the liens by purchasing a senior lien and foreclosing on the property. The question is whether the creditor whose lien was erased can avoid this transfer in a bankruptcy proceeding. We agree with the bankruptcy court that it can and therefore affirm.

I

A property in the Fort Worth suburbs is the focus of this appeal. Morash bought that property, a former Home Depot, through his single-member limited liability company called 7901. The purchase required a $3.4 million loan from a bank, which placed a lien on the property. The bank's lien was junior to a pre-existing $100,000 property tax lien issued by Tarrant County.

7901 leased the property to a tenant that wanted to turn it into a shooting range. The tenant borrowed $180,000 from the City of North Richland Hills, which resulted in another lien on the property. This lien took third priority behind the county and bank liens.

The lien-saddled property suffered setbacks. The first was a violent storm that damaged the roof. 7901 employed a roofing company—Valley Ridge—to fix the roof, but Valley Ridge's costs for the repair exceeded what 7901's insurance paid. 7901 and Valley Ridge thus went to arbitration, where Valley Ridge was awarded over $500,000 plus post-judgment interest. Valley Ridge recorded a judgment lien against the property. This was the fourth lien on the property. In order of priority, the liens were: (1) the $100,000 county lien; (2) the $3.4 million bank lien; (3) the $180,000 city lien; and (4) the $500,000-plus judgment lien.

Meanwhile, the tenant defaulted on and then abandoned its lease. 7901 tried selling the property but the attempt fizzled. The property remained vacant and produced no income. Consequently, 7901 ran out of

cash. Morash continued to pay 7901's bills with money from his other companies. And because Valley Ridge's judgment remained unsatisfied, it filed a petition in state court to foreclose on the property.

Per the bankruptcy court's findings, Morash's chicanery began sometime around then. He formed a new company called Silver State, which, like 7901, was owned and controlled solely by him. Morash and his lawyer—who also represented Silver State and 7901—convinced North Richland Hills to sell its $180,000 lien to Silver State. Knowing that the city wanted an owner who had the time and resources to maintain the property, Morash and his lawyer lied to the city that they had a prospective buyer. They also told the city that the sale to that buyer would occur only if they "clear[ed] [the] title of certain historical liens impacting marketability." In fact, no buyer existed at the time. The city nevertheless sold the lien to Silver State for $180,000.

Silver State then foreclosed on the property. A trustee appointed by Silver State convened the sale. The trustee filed and posted all notices about the foreclosure required by Texas law. But to speed up the foreclosure process, Morash—on behalf of 7901—waived (1) Silver State's requirement to provide thirty days' notice before the foreclosure and (2) 7901's right to cure its default. At the foreclosure sale, Silver State submitted a credit bid of $200,000. The trustee accepted the bid, and the property was Silver State's. The foreclosure extinguished Valley Ridge's junior judgment lien. And the deed conveying the property was recorded five days later.

Valley Ridge did not find out about the foreclosure until more than a month after it happened. While Morash and the lawyer were maneuvering to acquire the city lien, they were also stalling Valley Ridge's foreclosure. Acting on 7901's behalf, they misled Valley Ridge into believing that they were going to sell the property to a buyer and satisfy Valley Ridge's judgment.

No. 21-10212

For example, a few days after Silver State acquired the city lien and its notice of foreclosure was filed, Valley Ridge asked the lawyer about the status of the property. The lawyer responded that "the buyer has not agreed to final terms." Morash and the lawyer delayed recording the assignment of the city lien until after the foreclosure sale. Even after the sale was complete, the lawyer continued to lie to Valley Ridge about whether a buyer was interested in the property.

When Valley Ridge eventually found out about the foreclosure, it amended its state court petition against 7901 to add claims against Silver State under the Texas Uniform Fraudulent Transfer Act (TUFTA). Silver State, in turn, filed for Chapter 11 bankruptcy. By this point, Silver State had found a legitimate third party to buy the property and wanted to use the Bankruptcy Code's "free and clear" sale provision to sell the property without the looming cloud of Valley Ridge's TUFTA claims. After filing the bankruptcy petition, Silver State removed Valley Ridge's state court proceeding to the bankruptcy court.

In a separate proceeding, Valley Ridge initiated an involuntary Chapter 7 bankruptcy against 7901. The trustee in that proceeding filed her own complaint against Morash and Silver State alleging preferential transfer and fraudulent transfer under the Bankruptcy Code, breach of fiduciary duty, conspiracy, and other claims.

These disparate proceedings were eventually consolidated before the bankruptcy court handling Silver State's Chapter 11. In that proceeding, the bankruptcy court allowed Silver State to sell the property to the third party with the caveat that the disputed proceeds would be deposited in the court's registry until resolution of the claims against Silver State.

The property was thus sold. From the proceeds, Silver State paid the county and bank liens. The bankruptcy court then approved a compromise

4

No. 21-10212

whereby Valley Ridge would assume the trustee's claims against Morash and Silver State, and the trustee would receive $50,000 from the sale proceeds. When the scores were settled, more than half a million dollars remained in the court's registry. All claims against Silver State and Morash—both Valley Ridge's and the trustee's (assumed by Valley Ridge)—proceeded in Silver State's bankruptcy.

The bankruptcy court ruled in Valley Ridge's favor on multiple, but not all, grounds. It held that Valley Ridge could avoid Silver State's foreclosure as (1) an actual fraudulent transfer under section 548 of the Bankruptcy Code, (2) a preferential transfer under section 547 of the Bankruptcy Code, (3) an actual fraudulent transfer under section 24.005(a)(1) of TUFTA (through section 544 of the Bankruptcy Code), and (4) a constructive fraudulent transfer under section 24.006(b) of TUFTA (through section 544 of the Bankruptcy Code). It further held that Morash breached his fiduciary duty to 7901 and that Silver State conspired with him and aided and abetted the breach. It awarded Valley Ridge the funds remaining in the registry—which at this point amounted to $587,750.96— and $84,000 in attorney's fees, plus conditional appellate attorney's fees.

Morash appealed[1] and Valley Ridge cross-appealed. The bankruptcy court certified a direct appeal to this court under 28 U.S.C. § 158(d), which we authorized.

II

Although the bankruptcy court addressed various claims in its 83-page ruling, we affirm its judgment based on one: section 24.006(b) of TUFTA as

---

[1] As did Silver State and 7901. But given that Morash controls those entities, we refer to appellants collectively as "Morash" for the remainder of the opinion.

incorporated through section 544 of the Bankruptcy Code.[2]  The TUFTA claim fully supports the judgment awarding Valley Ridge the remaining proceeds and attorney's fees.  Indeed, TUFTA was the source of the bankruptcy court's fee ruling.  *See* Tex. Bus. & Com. Code § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just.").

Various provisions in the Bankruptcy Code allow creditors to "avoid transactions which unfairly or improperly deplete a debtor's assets or that unfairly or improperly dilute the claims against those assets."  5 Collier on Bankruptcy ¶ 548.01.  Section 544 is one of them.  That gateway provision allows trustees to avoid transfers that, under applicable state law, are voidable by creditors.  15 U.S.C. § 544(b)(1).

One such applicable state law is TUFTA.  "TUFTA's purpose is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach."  *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016).  Under TUFTA, creditors can set aside transfers of property afflicted by actual or constructive fraud.  *See, e.g.*, Tex. Bus. & Com. Code § 24.005.  Section 24.006(b)—one of the constructive-fraud provisions— provides that a "transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."  *Id.* § 24.006(b).

The issue is whether this constructive-fraud provision encompasses Silver State's foreclosure.  Morash does not contest most elements of the

---

[2] We thus do not address the other issues on which the bankruptcy court ruled, like preferential transfer and breach of fiduciary duty.

statute.  Given that both Silver State and the debtor, 7901, were owned and controlled by the same person, Morash wisely acknowledges that Silver State was an insider of 7901.  *See In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (explaining that an important factor for insider status is "the closeness of the relationship between the transferee and the debtor").  Morash also concedes that 7901 was insolvent and that Silver State knew of the insolvency.

The main dispute is whether Silver State's foreclosure was a "transfer made by a debtor."  Tex. Bus. & Com. Code § 24.006(b).  The plain meaning of the phrase indicates that it was.  7901 parted with its property through a foreclosure and thus transferred it to Silver State.  *See Transfer*, Black's Law Dictionary 1727 (10th ed. 2014) ("The term [transfer] embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.").  Morash nonetheless contends that it was not.

First, Morash argues that the transfer of the property to Silver State was not "made by a debtor" because the foreclosure trustee, not 7901, signed the deed effectuating the transfer.  His view is that foreclosures are not transfers "made by a debtor" as TUFTA requires but are instead transfers made by third parties.  But cases hold otherwise.  *See, e.g.*, *Abramson v. Lakewood Bank & Trust Co.*, 647 F.2d 547, 548–9 (5th Cir. 1981) (construing "transfer suffered by such debtor" to encompass foreclosures); *In re Cowin*, 492 B.R. 858, 901–03 (S.D. Tex. 2013) (holding that a foreclosure was an actual fraudulent transfer under TUFTA); *PDVSA Petroleo S.A. v. Trigeant, Ltd.*, 2012 WL 3249531, at *10 (S.D. Tex. Aug. 7, 2012) ("[T]he foreclosure sale constituted a transfer of an asset [under TUFTA].").  This view is also inconsistent with Morash's concession that collusive foreclosures can constitute actual fraudulent transfers, given that such transfers also must be

made by a debtor. *See* Tex. Bus. & Com. Code § 24.005(a)(1); 11 U.S.C. § 548(a)(1)(A). Indeed, the case on which Morash principally relies—*BFP v. Resol. Trust Corp.*—explains that "foreclosure sales fall within the general definition of 'transfers'" in the Bankruptcy Code and that "a transfer may be avoided as fraudulent even if it was against the debtor's will." 511 U.S. 531, 543 n.7 (1994); *see also Janvey*, 487 S.W.3d at 572 (noting that TUFTA and the Bankruptcy Code are often construed similarly because TUFTA is drawn from analogous bankruptcy authority).

TUFTA defines "transfer" broadly; a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Tex. Bus. & Com. Code § 24.002(12). This expansive definition suggests no distinction between voluntary transfers made personally by the debtor and involuntary transfers effectuated by third parties. The mode of the transfer does not matter; what matters is whether property changes hands from debtors to creditors. TUFTA's broad language—not to mention its implicit recognition that foreclosures are transfers made by debtors, *see id.* § 24.004(b)—defeats Morash's first argument.

Second, Morash contends that the foreclosure was not a transfer because the property that Silver State foreclosed on was not an "asset." Recall that under TUFTA, the transfer must be of "an asset or an interest in an asset." *Id.* § 24.002(12). An asset, in turn, is the "property of a debtor," but, as relevant here, only to the extent that the property is not "encumbered by a valid lien." *Id.* § 24.002(2). Morash argues that the property was not an "asset" when it was transferred because the liens on it exceeded its value.

We disagree. To determine whether the property was an "asset," the bankruptcy court had to determine its value when it was transferred. It found that the value was $4.2 million. Ample evidence supports this factual

finding—which we can disturb only if clearly erroneous. *See In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 293 (5th Cir. 2013). The court looked to testimony valuing the property at $4.9 million as well as conflicting testimony about the effect foreclosures have on property value. It also considered that, less than two months after the foreclosure, the property sold for over $4.2 million despite being encumbered by the county and bank liens and despite no changes in market conditions. Indeed, Silver State itself valued the property at $4.2 million in its bankruptcy schedules and in an interrogatory. *See In re Rollings*, 451 F. App'x 340, 348 (5th Cir. 2011) (noting that statements in bankruptcy schedules could be treated as judicial admissions).

*BFP* does not dictate a different result. *See* 511 U.S. 531. That case was about a bankruptcy statute that sets aside transfers in which debtors receive less than "reasonably equivalent value" for their property. *Id.* at 535 (addressing 11 U.S.C. § 548(a)(2)(A)). The Supreme Court held that the sales price at a regularly conducted and noncollusive foreclosure constitutes "reasonably equivalent value" and that courts should not second-guess foreclosure prices by searching for "fair market value." *Id.* at 537. The Court rejected the use of an alternative measure of reasonably equivalent value because doing so would have cast a "federally created cloud" over foreclosure sales conducted under state law. *Id.* at 544. But *BFP*'s concern that bankruptcy law might "displace traditional state regulation" is absent when the underlying claim is under state law. *Id.* In other words, the meaning of "reasonably equivalent value" in the Bankruptcy Code does not control what value courts should assign a property in calculating whether it is an asset under TUFTA. *BFP* does not constrain the more generalized factual inquiry required to determine a property's value. *See In re 1701 Commerce, LLC*, 511 B.R. 812, 831 (N.D. Tex. 2014) (using fair market value as the relevant benchmark); *PDVSA*, 2012 WL 3249531, at *7 (not using foreclosure price

as property's value). To be sure, the $200,000 that the property sold for in foreclosure is relevant in determining its market value. *See 1701 Commerce*, 511 B.R. at 831 (noting that foreclosure "still affects fair market value negatively"). And here the bankruptcy court did consider the foreclosure price, as part of "all relevant evidence," before arriving at its conclusion on the property's worth. Given the considerable evidence that the property was worth more than what it was sold for, the bankruptcy court did not clearly err in finding that the property was worth $4.2 million at the time of transfer.

Nor did the liens on the property exceed its $4.2 million value when it was transferred. The transfer occurred when the deed was recorded days after the foreclosure. *See* Tex. Bus. & Com. Code § 24.007(1)(A) ("[A] transfer is made . . . with respect to an asset that is real property . . . when the transfer is so far perfected that a good faith purchaser of the asset from the debtor . . . cannot acquire an interest in the asset that is superior to the interest of the transferee."); *Corpus v. Arriaga*, 294 S.W.3d 629, 635 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding that a transfer is perfected when the deed is recorded). At that point, the remaining liens on the property were the county lien of $99,508.99 and bank lien of $3,236,995.55. Under TUFTA, "the value of property in excess of a valid lien encumbering the property is an 'asset.'" *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 82 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The property was therefore an asset to the extent of the difference between its value and the sum of the liens—$863,495.46.

Morash's next argument is that a transfer is fraudulent under section 24.006(b) only if it was made in exchange for insider debt. But the text of section 24.006(b) has no insider-debt requirement. The debt only needs to be antecedent. *See* Tex. Bus. & Com. Code § 24.006(b); *Osadon v. C&N Renovation, Inc.*, 2018 WL 2126821, at *6 (Tex. App.—Dallas May 9, 2018, pet. denied). In other words, the debt must exist "before a debtor's

No. 21-10212

transfer of an interest in a property." *Antecedent Debt*, BLACK'S LAW DICTIONARY 488 (10th ed. 2014). The debt that 7901 owed Silver State (after Silver State assumed it from the city) was plainly antecedent because it existed before the foreclosure took place.

The last question is whether Morash is entitled to the value of the lien on which he foreclosed. TUFTA has a safe-harbor provision under which good faith transferees are entitled to a reduction in liability equal to the amount they paid. *See* TEX. BUS. & COM. CODE § 24.009(d)(1).[3] But Morash cannot benefit from this provision. He was not a good faith transferee. As the district court found, Morash and his lawyer lied to and misled Valley Ridge about the foreclosure. Morash thus receives no liability reduction under the safe harbor.[4]

\* \* \*

Valley Ridge can avoid Silver State's foreclosure under section 24.006(b) of TUFTA and section 544 of the Bankruptcy Code.

AFFIRMED.

---

[3] This safe harbor tempers Morash's concerns that allowing Valley Ridge to avoid the Silver State foreclosure will throw all foreclosure markets into a tailspin.

[4] Accordingly, we need not address the equitable-subordination issue that Valley Ridge cross-appealed. In any event, that issue—which would not have expanded Valley Ridge's full victory at the bankruptcy court—should have been raised in Valley Ridge's appellee brief as an alternative ground for affirmance rather than in a cross-appeal. *See Domain Protection, L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529, 539–40 (5th Cir. 2022).

No. 21-10212

EDITH H. JONES, *Circuit Judge,* Dissenting

Thank goodness this opinion is unpublished and therefore non-precedential. I respectfully but ardently dissent. The upshot of the majority opinion is essentially to revivify the discredited *Durrett*[1] rule under the guise of interpreting TUFTA. In one sense, this decision applies only to TUFTA as enacted in Texas, and our court's interpretation of Texas law doesn't even bind state courts. More broadly, if taken seriously, this decision could affect the finality of foreclosures in other states that have adopted materially similar versions of TUFTA.

The *Durrett* decision wrought havoc in the market for nonjudicial foreclosure sales by holding that regularly conducted non-collusive nonjudicial foreclosure sales for less than the "reasonably equivalent value" of the property could be avoided in bankruptcy as constructive fraudulent transfers. *See* 11 U.S.C. § 548(a)(1)(B).[2] *Durrett* determined that "reasonably equivalent value" could be based on a standard real estate appraisal technique rather than the sale price determined at the forced sale. The Supreme Court reversed. Among other things, the Court carefully explained that such a mode of valuation simply does not represent the real-world effect of a valid non-collusive forced sale on the value of real property.[3]

---

[1] *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (5th Cir. 1980), *abrogated by BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 114 S. Ct. 1757 (1994).

[2] For instance, in *BFP v Resolution Trust*, which overruled *Durrett* more than a decade after *Durrett* was decided, the Supreme Court observed that title insurers had "reacted to the *Durrett* rule by including specially crafted exceptions from coverage in many policies issued for properties purchased at foreclosure sales." *BFP*, 511 U.S. at 544, 114 S. Ct. at 1765 (citation omitted).

[3] The Court explained that "[a]n appraiser's reconstruction of 'fair market' value could show what similar property would be worth if it did not have to be sold within the

No. 21-10212

In this case, the majority finds a "constructive fraudulent transfer," Tex. Bus. Comm. Code § 24.006(b), because the debtor's involuntary "transfer" was of "an asset or an interest in an asset," § 24.002(12), and an "asset" must be the "property of a debtor" to the extent that the property is not "encumbered by a valid lien." § 24.002(2). The majority then holds, just as this court erroneously did in *Durrett*, that the combined TUFTA definitions allowed the court to "value" the foreclosed property *not at the date of foreclosure and based on the foreclosure auction,* but at the amount for which it was sold in a non-foreclosure sale months later.[4]

Essentially, the majority moves the *Durrett* valuation error into the definitional framework of TUFTA in all its applications. The *BFP* decision, to be sure, interpreted the Bankruptcy Code's fraudulent conveyance provision and does not control our interpretation of Texas law. But *BFP* described the parallel history of fraudulent transfer law and foreclosure law and found that they "enjoyed over 400 years of peaceful coexistence in Anglo-American jurisprudence until the Fifth Circuit's unprecedented 1980 decision in *Durrett.*" *BFP*, 511 U.S. at 542, 114 S. Ct. at 1764. Likewise in

---

time and manner strictures of state prescribed foreclosure. But property that must be sold within those strictures is simply worth less. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques." *BFP*, 511 U.S. at 539-40.

[4] The majority opinion neglects to mention that the bankruptcy court found no legal fault in the way in which Silver State's foreclosure on the City lien was handled and conducted by Morash (using his name synonymously with his wholly owned entities). The majority also neglects to mention that for all the "misleading" conduct on behalf of Morash, he owed no duty in Texas law to inform Valley Ridge about the upcoming foreclosure, for which valid public notice was provided. *See* Tex. Prop. Code § 51.002(b); *see also Am. Sav. & Loan Ass'n v. Musick,* 531 S.W.2d 581, 588 (Tex. 1975) (a junior lienor is not entitled to particularized notice of the foreclosure).

this case, we have found no Texas court case that has ever construed TUFTA to impugn a regularly conducted noncollusive nonjudicial foreclosure.

The indications from Texas law, instead, are contrary to the majority opinion. As noted before, the trustee points to not a single Texas case that has ever avoided under TUFTA a regularly conducted noncollusive nonjudicial foreclosure sale; indeed, the trustee sniffs at the idea such a citation is even necessary.[5] Yet as with the distinct novelty of the *Durrett* opinion's alleged plain reading of the Bankruptcy Code, one would think that some venerable case law might have construed TUFTA or its predecessor statutes to undo a creditor's foreclosure sale. The silence of precedent is deafening. Further, in *Yokogawa Corp. v. Skye Intern Holdings*, the court upheld summary judgment in favor of two secured creditors who foreclosed on the borrower's assets and sold them to a third defendant. *Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc.*, 159 S.W.3d 266 (Tex. App. 2005). The court stated:

> "We agree that the foreclosure and subsequent transfer of assets to Skye Delaware are not covered by TUFTA. A secured party is entitled to foreclose on its security interest in the event of default . . . . Nor is the subsequent transfer of the assets from the foreclosure sale actionable under TUFTA. Under TUFTA, 'transfer' means disposing or parting with an asset. Tex. Bus. & Com. Code Ann. § 24.002(12) (Vernon 2002). Because the property Moore and Trojan purchased at the foreclosure sale was encumbered by a valid lien, TUFTA is inapplicable." *Yokogawa*, 159 S.W.3d at 269.

---

[5] Only one case is on point, *PDVSA Petroleo S.A. v. Trigeant, Ltd.*, WL 3249531 (S.D. Tex. Aug. 7, 2012). But that case issued from a bankruptcy court, is not binding on our interpretation of Texas law, and during appeal to the Fifth Circuit the parties settled, preventing any more definitive ruling.

Moreover, the majority's application of two definitions in TUFTA effectively overrides a specific provision, which defines "value" accruing from foreclosure sales to override *Durrett*. Section 24.004(b) provides that:

> For the purposes of Sections 24.005(a) and 24.006 of this code, a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale…for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

According to the relevant comment to section 3 of the Uniform Act, from which this provision is derived, subsection (b) "rejects the rule of such cases as *Durrett* and *Abramson* . . . [and] adopts the view taken in . . . *In re Madrid* . . ., that the price bid at a regularly conducted and noncollusive foreclosure sale determines the fair value of the property sold." Unif. Fraudulent Transfer Act § 3 cmt. 5. By its terms, Section 24.004(b) encompasses Sec. 24.006(b), on which the majority here relies. I contend that this specific withdrawal of liability for regularly conducted noncollusive foreclosure sales controls, under standard principles of statutory construction, over the general statutory definitions. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 183-88 (2012) (Scalia & Garner). If it were otherwise, the definitions could render Sec. 24.004(b) practically meaningless.

A final note about the majority's pejorative description of the facts. The bankruptcy court found Morash's attorney less than candid about maneuverings that preceded Silver State's foreclosure on 7901's real property, although the bankruptcy court almost exclusively uses the term "misled" rather than "lied." But the majority omits to note that for nearly two years, Morash personally kept 7901's bank loan current and paid upkeep on 7901's vacant parcel, all at a cost of thousands per month, and sought to

market the property unsuccessfully.  Ultimately, Valley Ridge secured a fourth lien on the parcel.  When Silver State purchased the City's third lien for nearly full value, as it was entitled to do, and noticed foreclosure, Valley Ridge or any outside party could have bid in at the foreclosure sale, subject to whatever prior liens were not cut off.  Morash properly notes that had the parcel been sold through a bankruptcy trustee's sale pursuant to 11 U.S.C. § 363 (sale free and clear of liens), Morash or Silver State could have accomplished exactly the same result that obtained here outside of bankruptcy.  Valley Ridge was not fully paid for roofing the building at 7901, but Morash's losses from this venture surely exceed those of Valley Ridge.[6]

If this were a precedential opinion, I fear it would subject regularly conducted, nonjudicial foreclosure sales in Texas to the same post hoc challenges and market uncertainty that followed in the wake of *Durrett*.  I respectfully dissent.

---

[6] The majority declines to review the bankruptcy court's additional findings that Morash's transactions actually intended to hinder, defraud, or delay creditors, Tex. Bus. & Comm. Code Sec. 24.005(a), constituted a preferential transfer pursuant to 11 U.S.C. Sec. 547, and somehow violated some fiduciary duty of some kind owed by Morash.  I would reverse the bankruptcy court on those grounds for liability and reverse the judgment in toto.